In re David B. KERBAUGH and
Mary K. Kerbaugh, Debtors.

FIRST INTERNATIONAL
BANK, Plaintiff,

v.

David B. KERBAUGH and Mary
K. Kerbaugh, Defendants.

Bankruptcy No. 92–31237.
Adv. No. 93–07028.

United States Bankruptcy Court,
D. North Dakota.

Sept. 15, 1993.

Roger J. Minch, Fargo, ND, for plaintiff.

Charles Chinquist, Fargo, ND, for defendants/debtors.

## MEMORANDUM AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

The plaintiff-creditor, First International Bank (Bank), commenced the above-entitled adversary proceeding by complaint filed on April 6, 1993, seeking a determination that outstanding indebtedness which arose from credit card advances and purchases on the debtors' joint account was nondischargeable pursuant to sections 523(a)(2)(A), 523(a)(2)(B), and 523(a)(2)(C) of the Bankruptcy Code. The Bank further seeks the recovery of costs and attorney's fees pursuant to section 523(d) of the Bankruptcy Code. The defendant-debtors, David B. Kerbaugh and Mary K. Kerbaugh, generally deny the allegations set forth in the complaint.

Trial was held on August 23, 1993. From the evidence presented and arguments made,

the court makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

The Bank and Kerbaugh, first became acquainted when Kerbaugh approached the plaintiff in order to procure business for a corporation recently formed by Kerbaugh named Great Plains Financial Services, Inc. The corporation was designed, in part, to place credit card processing services for businesses unable to otherwise obtain merchant agreements with processing banks and credit card issuers. Although a business relationship between Great Plains Financial Services, Inc. and the Bank never materialized, Mr. Kerbaugh was invited by Dale Wilkens, Executive Vice–President of First International Bank, to complete a personal credit card application.

Kerbaugh elected to accept Wilkens' invitation and accordingly completed the credit application and requested a Visa credit card to be issued on a joint account. The application was executed by both David and Mary Kerbaugh on August 13, 1990 and shortly thereafter delivered to the Bank. The credit application represented that Mr. Kerbaugh's gross income was $5,000.00 per month and that Mrs. Kerbaugh's gross income was $2,000.00 per month and indicated that they each had been earning those respective amounts for a two-year period. It disclosed a monthly rental payment of $650.00 and, under the heading of "credit information," itemized other monthly indebtedness totalling $1,075.00. Nothing about the application appeared to Wilkens to be "out of the ordinary" especially since Kerbaugh indicated that the financing of the formation of Great Plains Financial Services, Inc. was being accomplished predominantly by venture capital in the form of equity infusions rather than indebtedness.

In accordance with standard operating procedures, the Bank obtained a copy of the Kerbaughs' credit report in connection with making the decision of whether or not to extend the Kerbaugh's the credit they requested. An examination of the credit report revealed a prior bankruptcy, a fact that surprised Wilkens in light of the financial strength exhibited in the debtors' credit application. Although Wilkens testified that the Bank always gave "extra attention" to credit applications where it is discovered that an applicant has previously filed for bankruptcy, the credit report in the instant case reflected that the former obligations had been discharged and the Kerbaugh's payment history since the bankruptcy discharge had been satisfactory. Upon inquiry by Wilkens, Kerbaugh's explanation intimated that the bankruptcy was the result of a business failure that consumed personal resources· rather than an inability to control personal expenditures. Moreover, the debtors' disclosed aggregate indebtedness, as represented in the credit application, appeared to be nominal in relation to their reported income which led Wilkens to conclude that the debtors were able to truly effectuate a fresh start.

Bank policy required two officers to review and approve all credit applications. The Bank's president, Steve Stenjem, made the initial approval of the Kerbaugh's credit application, although it is not clear from the evidence before the court what information he reviewed in connection with the decision. Based upon the strength of the credit application, the payment history since the bankruptcy as reflected in the credit report, and Kerbaugh's explanations with respect to both the former bankruptcy and the new business venture, Wilkens also approved the credit application. On September 5, 1990, over three weeks after the debtors completed the application, the Bank mailed the Kerbaughs a Visa credit card with an initial credit limit of $2,000.00.

From the date of issuance in September 1990 until June 1992, the credit card was utilized primarily in connection with business-related expenses and payments on the indebtedness were made in accordance with agreed upon terms. During that same time frame, periodic requests for "temporary" credit limit increases were made by Mr. Kerbaugh in order to accommodate necessary expenditures. These requests were honored by the Bank. In June 1992, Mr. Kerbaugh requested a "permanent" increase in the credit limit to $3,000.00. As a prerequisite to

the permanent credit limit increase, the Bank required the defendants to submit a financial statement. Mr. Kerbaugh submitted a relatively detailed financial statement dated June 1, 1992, which reflected, among other things, that the he and his wife had $312,500.00 in total assets and $2,000.00 in total liabilities.[1] Wilkens reviewed the financial statement in connection with the request for a credit increase and supplemented it with information obtained from Kerbaugh over the telephone regarding his employment. Additionally, Wilkens obtained another credit report on June 15, 1992, which reflected information similar to that portrayed in the initial credit report. Since there was nothing in the credit application or credit reports which casted any doubt or raised any red flags with respect to the strength of the submitted financial statement or initial credit application and the defendants' payment history with respect to the card had been satisfactory to that point, Mr. Wilkens authorized the credit limit increase on June 17, 1992.

On December 29, 1992, approximately six months after the submission of the financial statement to the Bank in connection with the credit limit increase, the defendant-debtors filed a joint petition for bankruptcy under Chapter 7 of the Bankruptcy Code. When compared to the credit application and financial statement that was submitted to the Bank, the bankruptcy schedules reveal a markedly different picture of the defendants' financial position. An examination of the debtors' schedules reveal that the debtors had, as of the date of the bankruptcy filing, $8,075.00 in total assets and $599,719.00 in total liabilities. Moreover, Mr. Kerbaugh testified that although the debtors' initial credit application, dated August 13, 1990, indicated a household income of $7,000.00 per month, the debtors' actual 1990 income was negligible.[2]

---

1. The June 1, 1992 financial statement was not signed by either of the defendants in this case. Although it was prepared by Mr. Kerbaugh and contains his name as a heading, the financial statement contains no reference to Mrs. Kerbaugh. There was no evidence indicating that Mrs. Kerbaugh either adopted the financial statement or assisted in its preparation. Mr. Ker-

## CONCLUSIONS OF LAW

### 1.

■ Section 523 of the United States Bankruptcy Code enumerates specific exceptions to the general rule of the dischargeability of debts in bankruptcy. In determining whether a particular debt falls within the ambit of an exception to discharge under 11 U.S.C. § 523, the statute should be construed liberally in favor of the debtor and strictly against the objecting creditor in order to effectuate the fresh start principles which pervade the entire bankruptcy system. *Gleason v. Thaw,* 236 U.S. 558, 562, 35 S.Ct. 287, 289, 59 L.Ed. 717 (1915); *Caspers v. Van Horne (In re Van Horne),* 823 F.2d 1285, 1287 (8th Cir.1987); 3 *Collier on Bankruptcy,* ¶ 523.05A at 523–19 (15th ed. 1993). This liberal construction is, however, tempered by the view that such equitable considerations ' "are applicable only to honest debtors." ' *Van Horne,* 823 F.2d at 1287 (quoting *In re Hunter,* 771 F.2d 1126, 1130 (8th Cir. 1985)).

■ One of the operative provisions relied upon by the plaintiff, First International Bank, to establish a basis for the nondischargeability of the debt owed by the defendants is § 523(a)(2)(B), which renders nondischargeable in a Chapter 7 case any debt:

> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
>
> \*      \*      \*      \*      \*      \*
>
> (B) use of a statement in writing—
> (i) that is materially false;
> (ii) respecting the debtor's or an insider's financial condition;
> (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

baugh testified, however, that the financial statement was intended to represent a combined picture of the debtors' assets and liabilities.

2. Mr. Kerbaugh testified that his approximate annual gross income for tax purposes in 1990 totalled between $5,000.00–$10,000.00.

(iv) that the debtor caused to be made or published with intent to deceive; . . .

11 U.S.C. § 523(a)(2)(B).

Thus, under the foregoing section, a creditor may have a debt owed to it declared nondischargeable provided that the following six elements are established:

(1) the debtor makes, (2) a statement in writing, (3) respecting the debtor's or an insiders [sic] financial condition, (4) which statement is materially false, (5) which is made with the intent to deceive, and (6) which is reasonably relied upon by the creditor.

*Avco Fin. Servs., Inc. v. Frey (In re Frey )*, 150 B.R. 742, 745 (Bankr.D.N.D.1992). Each of the § 523(a)(2) elements must be proved, with the party objecting to dischargeability bearing the burden of proof with respect to each element. *Management Jets Int'l, Inc. v. Mutschler (In re Mutschler )*, 45 B.R. 482, 490 (Bankr.D.N.D.1984). *See* F.R.Bankr.P. 4005. The proper standard of proof applicable in nondischargeability actions which arise under § 523(a) was conclusively established by the United States Supreme Court as the ordinary preponderance of the evidence standard. *Grogan v. Garner*, 498 U.S. 279, 283–91, 111 S.Ct. 654, 657–661, 112 L.Ed.2d 755 (1991).

With the foregoing standard in mind, the court will measure the facts of this case as previously outlined against the legal elements that the plaintiff must establish to support a finding of nondischargeability under § 523(a)(2)(B) of the Bankruptcy Code.

2.

*In Writing Respecting the Debtor's Financial Condition*

■ The initial hurdle in a § 523(a)(2)(B) exception determination is essentially a two-prong test, the first element being the demonstration of a document, while the second element focusing on the content of the document.

■ In order for a statement made by the debtor to render a debt nondischargeable under § 523(a)(2)(B), the statement, to be in writing, must have been either signed by the debtor, written or produced by the debtor, or have been adopted and used by the debtor.

*Mutschler*, 45 B.R. at 490; *Household Fin. Corp. v. Howard (In re Howard )*, 73 B.R. 694, 702 (Bankr.N.D.Ind.1987); 3 *Collier on Bankruptcy*, ¶ 523.09 at 523–61 (15th ed. 1993). An objecting creditor that relies on a debtor's oral misrepresentations of his or her financial wherewithal will not be entitled to a nondischargeability determination under § 523(a)(2)(B). Honorable Nancy C. Dreher & Matthew E. Roy, *Bankruptcy Fraud and Nondischargeability Under Section 523 of the Bankruptcy Code*, 69 N.D.L.Rev. 57, 76 (1993). Similarly, subsection (B) cannot be satisfied by just any writing. It must be a statement in writing "respecting the debtor's financial condition". 11 U.S.C. § 523(a)(2)(B). However, it is significant to note that the document utilized by a debtor need not be a traditional financial statement. For example, the debtor in *Household Fin. Corp. v. Howard (In re Howard )*, 73 B.R. 694 (Bankr.N.D.Ind.1987), applied for a loan from the creditor by completing the requisite paperwork which called for a listing of outstanding indebtedness. The debtor's written response omitted a number of obligations that could not be detected by normal commercial methods. The Bankruptcy Court for the Northern District of Indiana concluded that the debt was nondischargeable and stated that:

To render a debt nondischargeable it is not necessary that the false written statement concerning the financial condition of the debtor be included in a formal financial statement; any written document will serve as § 523(a)(2)(B) refers to a much broader class of statement—those "respecting the debtor's financial condition." The writing required by § 523(a)(2)(B) is sufficiently broad enough to include any statement made by the Debtor, not just formal financial statements and documents in a bank or commercial setting.

*Howard*, 73 B.R. at 770 (citations omitted). *See also Engler v. Van Steinburg*, 744 F.2d 1060, 1061 (4th Cir.1984) (holding an equipment list which the debtor submitted to secure a loan to be a statement in writing respecting his financial condition sufficient to satisfy § 523(a)(2)(B)); *Butler v. Roberts (In re Roberts )*, 54 B.R. 765, 770 (Bankr.D.N.D.

1985) (finding that, "[i]f in writing, (a)(2)(B) is sufficiently broad to include any statement made by the debtor and not just formal financial statements and documents used in a commercial or bank setting.").

■ The credit application in the instant case, although ostensibly written solely by Mr. Kerbaugh, was signed by *both* Mr. and Mrs. Kerbaugh.[3] The application, which served as a central component in the decision for the initial extension of credit by the plaintiff, required the Kerbaughs to provide "true and complete" information regarding their monthly income, monthly rental payments, and credit information portraying both aggregate and monthly payments on individual indebtedness. Admittedly, the credit application neither portrayed nor required the financial particularity of a financial statement such as a balance sheet or profit and loss statement; however, as previously set forth, such a requirement is not imposed by the mandates of § 523(a)(2)(B). *See, e.g., Citizens & Northern Bank v. Phillips (In re Phillips)*, 27 B.R. 646, 647 (Bankr.M.D.Pa. 1982) (finding written statements about encumbrances to be a matter concerning the debtors' financial condition). The credit application in the instant case, which was held out by the debtors as something which the plaintiff should rely, permits a realistic assessment of the debtors' creditworthiness and financial capacity by virtue of the disclosure of income and indebtedness. Accordingly, the credit application clearly qualifies as a statement made in writing respecting the debtors' financial condition.

### 3.
### *Materially False*

■ Once it is shown that the statement was in writing respecting the debtors' financial condition, the next requirement under § 523(a)(2)(B) is that the statement at the time it was made was not only false, but "materially false." A statement utilized by a debtor in order to obtain credit is "materially false" within the meaning of the statutory

exception to the discharge of debts if it not only contains erroneous information, but rather contains information that is substantially inaccurate. *Miller v. Boles (In re Boles)*, 150 B.R. 733, 740 (Bankr.W.D.Mo. 1993); *See Management Jets Int'l, Inc. v. Mutschler (In re Mutschler)*, 45 B.R. 482, 490, 491 (Bankr.D.N.D.1984) (stating that "[i]t is not sufficient to show that the statement is [merely] factually incorrect . . .", the falsity must be an "important or substantial untruth.").

■ The concept of "materiality" within the context of § 523(a)(2)(B) includes both objective and subjective components. Dreher & Roy, *supra*, at 76. Objectively, a statement is materially false for purposes of § 523(a)(2)(B) if it is one that "paints a substantially untruthful picture of a financial condition by misrepresenting information of the type which would normally affect the decision to grant credit." *Avco Fin. Servs. v. Frey (In re Frey)*, 150 B.R. 742, 745 (Bankr. D.N.D.1992). The relevant subjective inquiry, although not dispositive, is whether the complaining creditor would have extended credit had it been apprised of the debtor's true situation. *Jordan v. Southeast National Bank (In re Jordan)*, 927 F.2d 221, 224 (5th Cir.1991). This court has previously noted that:

> 'The question of materiality should be judged not on the basis of the size or seriousness or [sic] the error, but by a comparison of the debtor's actual financial condition with the picture he paints of it. A financial statement which markedly overstates the value of a person's assets, so as to distort his financial picture must be considered materially false.'

*Mutschler*, 45 B.R. at 491 (quoting *In re Denenberg*, 37 B.R. 267 (Bankr.D.Mass. 1983)) (citations omitted). Further, it is well established that the concealment, understatement, or omission of any of a debtor's material liabilities can readily constitute a statement which is materially false equally as well as a false assertion. *See Frey*, 150 B.R. at 745; *Mutschler*, 45 B.R. at 490–91.

---

3. A written statement does not have to be physically prepared by a debtor in order to satisfy the in writing requirement of § 523(a)(2)(B). *Chevy Chase Fed. Sav. Bank v. Graham (In re Graham)*, 122 B.R. 447, 451 (Bankr.M.D.Fla.1990). The in writing requirement of § 523(a)(2)(B) is satisfied if existence of the written statement was either signed, adopted and used, or caused to be prepared by the debtor. *Id.*

■ In this case, the credit application grossly overstated the debtors' monthly income.[4] The application, dated August 13, 1990, represents that the debtors' earned a combined monthly income of $7,000.00 and had earned that amount for a two-year period. Mr. Kerbaugh by his own admission conceded that the debtors' annual income for 1990 tax purposes was between $5,000–$10,000. Although Mr. Kerbaugh, by way of explanation, testified that the disclosed income figure was based on "projected" 1990 income which never materialized, the court finds his testimony on this point not credible.

The significance of the gross misrepresentation of income in the credit application in the instant case must be interpreted in light of the application's purpose. The purpose of the credit application is to enable a lender such as First International Bank to make a realistic assessment of the risk involved in extending the debtors the credit they requested. A primary determinant to such an assessment involves a debtor's reported income. Information regarding a borrower's income is normally of the type that would affect a bank's lending decision and certainly affected the lending decision in the instant case. Mr. Wilkens testified that the plaintiff in this case would not have extended the debtors the credit they requested had he known the debtors' true financial picture and this court believes that neither would any reasonable commercial lender. Accordingly, the court finds the gross misrepresentation of income rendered the credit application materially and substantially inaccurate.

4.

*Intent to Deceive*

■ Under § 523(a)(2)(B), a creditor must demonstrate by a fair preponderance of the evidence that the statement was made with an intention of deceiving the creditor. Although actual knowledge of the falsity of financial information provided by the debtor to a creditor will satisfy the intent requirement, a demonstration that the debtor acted with recklessness as to the truth or accuracy

of the submitted information will suffice. *Frey,* 150 B.R. at 745. It has thus been held that where a debtor either knowingly or recklessly makes a false representation which the debtor knows or at least should have known at the time the statement was made will induce a lender to extend credit, scienter or an intent to deceive sufficient to satisfy § 523(a)(2)(B) may be logically inferred. *Household Fin. Corp. v. Howard (In re Howard),* 73 B.R. 694, 703 (Bankr. N.D.Ind.1987). In holding that a reckless disregard for the truth can satisfy the intent requirement, it has been stated that:

'The Supreme Court decision in *Morimura, Arai & Company v. Taback,* 279 U.S. 24, 49 S.Ct. 212, 73 L.Ed. 586 (1929) provides further support for [such a] holding. In that case the Court held that "reckless indifference to the actual facts, without examining the available source of knowledge which lay at hand, and with no reasonable ground to believe that it was in fact correct" was sufficient to establish the knowledge element under a provision of the Bankruptcy Act then current which completely barred a discharge of all debts if the bankrupt had made a materially false statement in order to obtain property on credit. *Id.* at 33, 49 S.Ct. at 215. Since the 1960 amendment to the Bankruptcy Act, use of a materially false statement in order to obtain credit is no longer a complete bar to discharge for individual bankrupts, but is included in § 17(a)(2) along with false representations as one of the grounds which will render an individual debt nondischargeable. The close statutory relationship of these two concepts now suggests that a similar definition of knowledge would be appropriate. Further, a strict reading of the knowledge element of the false representation exception would have the incongruous effect of imposing a stricter standard for exempting a single debt from discharge than formerly was

---

**4.** Although no direct evidence was presented with respect to the issue of the liabilities as represented by the debtors in the credit application, a natural inference could be drawn from the debtors' bankruptcy schedules that, contrary to Mr. Kerbaugh's oral representation to Mr. Wilkens, that the debtors had incurred substantial personal debt associated with Great Plains Financial Services, Inc. which was omitted from the credit application.

required to completely bar discharge of all debts.

In addition, the scienter requirement in the tort of misrepresentation generally has been interpreted to include recklessness. *See* W. Prosser, Torts, § 701 (4th Ed. 1971). The reasons for inclusion, *viz.* the difficulty in distinguishing knowledge from reckless disregard, and to discourage the shunning of truth to preserve the defense of no scienter, are applicable with equal force in the bankruptcy context.

Finally, there are dicta in other decisions of this circuit which suggest that our interpretation is proper. *Matter of Nelson,* 561 F.2d 1342 (1977) ("knew of or should have known"); *Wright v. Lubinko,* 515 F.2d 260 (9th Cir.1975) ("fraudulent intent or reckless disregard for the truth tantamount to willful misrepresentation").'

*Howard,* 73 B.R. at 703–04 (quoting *In re Houtman,* 568 F.2d 651 (9th Cir.1978)). From the foregoing, it is clear that a subjective intent to deceive is not a prerequisite to a finding of "recklessness." *See Investors Credit Corp. v. Batie,* 995 F.2d 85, 90 (6th Cir.1993) (finding the intent to deceive element satisfied based on recklessness even if the debtor possessed no subjective intent to deceive).

■■■ Establishing the requisite intent to deceive element is difficult, however as previously intimated, "the mere fact that the statement is false and the debtor knew it was false has been held determinative of an intent to deceive." *Butler v. Roberts (In re Roberts),* 54 B.R. 765, 771 (Bankr.D.N.D. 1985). Moreover, a debtor's mere "unsupported assertions of honest intent will not overcome the natural inferences from admitted facts." 3 *Collier on Bankruptcy,* ¶ 523.10 at 523–72 (15th ed. 1993). Mr. Kerbaugh's own testimony revealed that the debtors' represented a monthly income figure in the credit application in August of 1990 that he knew was not *actually* being earned. His blind assertion that the figure was based on *projected* income for the year, if believed, would at least amount to a recklessness with respect to the truthfulness or accuracy of the reported information since, as demonstrated by the negligible earnings during 1990, there existed no reasonable grounds in fact to believe that the represented income was correct at the time of the making. The court must conclude that the element of intent to deceive has been met with the requisite degree of proof.

### 5.

#### *Reasonable Reliance*

■■■ For a debt to be excepted from discharge under § 523(a)(2)(B), the creditor's reliance on the materially false written statement must satisfy a two-part inquiry by demonstrating that its reliance was both actual and reasonable.

■■■ Actual reliance mandates that the creditor did in fact subjectively rely upon or utilize the submitted information when making the decision to extend credit. To establish actual reliance, a showing of a degree of proximate cause must be made. This court has found that:

Proximate cause is not, in the tort sense, an independent element of proof but is merely a way of clarifying the causation factor inherent from a complete reading of § 523(a)(2)(B). The preface to this section provides that a discharge does not discharge a debtor from a debt for obtaining an extension of credit *by* use of a false statement. Thus, the statute itself presupposes in the first instance that it was the statement which was the causative factor in the extension of credit, without which the other elements of this section are not even reached.

*Management Jets Int'l, Inc. v. Mutschler (In re Mutschler),* 45 B.R. 482, 492 (Bankr. D.N.D.1984). As such, a creditor must show that its reliance on the false statement was ' "a contributory cause of the extension of credit" ' and ' "that credit would not have been granted if the lender had received accurate information." ' *Marx v. Reeds (In re Reeds),* 145 B.R. 703, 707 (Bankr.N.D.Okla. 1992) (quoting *In re Anzman,* 73 B.R. 156, 164 (Bankr.D.Colo.1986)). *See Mutschler,* 45 B.R. at 492. It is well established, however, that although actual reliance must be demonstrated, the creditor does not have to show that the writing was the *only* influential fac-

tor in the decision to extend credit. *Mutschler*, 45 B.R. at 492. It is sufficient for § 523 if the creditor establishes that it *partially* relied on the false statement or that the false statement was the principal precipitant for the extension of credit, in the absence of which credit would not have been made. *Id.*

The reasonableness of a creditor's reliance on a false statement is an objective determination, i.e. that degree of care which a reasonably prudent creditor in an average business transaction under similar circumstances would exercise. *Marx v. Reeds* (*In re Reeds*), 145 B.R. 703, 707 (Bankr.N.D.Okla.1992); *Mutschler*, 45 B.R. at 492–93. In articulating the requisite objective inquiry, this court has stated:

> '[T]he reasonableness of a creditor's reliance on a [false] statement should be judged by comparing the creditor's actual conduct with (1) the creditor's own normal business practices, and (2) the standards and customs of the industry, (3) in light of the surrounding circumstances existing at the time the application was made and credit was extended.'

*Mutschler*, 45 B.R. at 493 (quoting *In re Patch*, 24 B.R. 563 (Bankr.D.Md.1982)). A related issue in examining the reasonableness of a creditor's reliance is whether the creditor was under a *per se* duty of verification or had an absolute duty to make independent inquiries into the financial condition of a debtor in order to confirm the authenticity of the writing. Although a creditor's reliance on a false statement has been found unreasonable where the false writing was obviously false on its face, when the creditor knows that the writing is incomplete or not accurate, or when the creditor's own investigation suggests that the writing was false or incomplete, there is no duty forced upon a creditor to make independent inquiries of an applicant's financial condition unless the statement is facially inaccurate or the creditor's normal business practices dictate such an inquiry in each instance. *Mutschler*, 45 B.R. at 493 (citing various authorities). The reasonable reliance requirement should not be a vehicle by which courts that have the benefit of 20–20 hindsight second guess the

wisdom of a creditor's lending decisions or policies with respect to the extension of credit. *See generally In re Reeds*, 145 B.R. at 707. Moreover, creditors that receive financial information and credit applications in connection with a loan or the extension of credit

> are entitled to rely on a written statement as being an accurate representation of what it purports to be as long as fraud is not apparent from the document itself. To rule otherwise would render the use of financial statements [and credit applications] meaningless and would run contrary to long established business practice regarding their preparation and use.

*Mutschler*, 45 B.R. at 493. The imposition of an absolute duty to verify "requires the creditor to be wary of any applicant and to assume that the material within the statement is not accurate. Such a defensive posture will most certainly restrict the flow of credit." Matthew D. Amhut, *Section 523(A)(2)(B): Exceptions to Discharge for Fraudulently Obtained Loans*, 5 Bankr. Dev.J. 151 (1987).

In this case, the evidence clearly established that the debtors' credit application played a meaningful role in the plaintiff's decision to extend credit. Although the plaintiff relied on Mr. Kerbaugh's oral representations and the debtors' credit report in addition to the joint credit application, the credit application was the precipitating cause in the extension of credit. There was nothing from the face of the credit application that raised any red flags which put, or reasonably should have put, the plaintiff on notice that the application was grossly inaccurate or that further investigation was warranted. However, First International Bank as a prudent lender conducted a commercially reasonable investigation of the information that had been supplied by the debtors in the credit application in order to ascertain their creditworthiness and did not merely rely upon the application alone. Indeed, it sought a credit report and made relevant inquiries with respect to the information contained in the credit report and regarding Mr. Kerbaugh's business venture with Great Plains Financial Services, Inc., all of which seemed

to justify the decision to extend the debtors the credit they requested. Upon receiving a request for an increase in the debtors' credit limit, the plaintiff requested a detailed financial statement from the debtors and attempted to verify that information by obtaining an additional credit report in an effort to ascertain the existence and accuracy of listed indebtedness and updated information regarding income and sources thereof by telephoning Mr. Kerbaugh. It should be noted that this is not a case where investigation and verification would have uncovered the falsity of the represented income.

The court is satisfied that First International Bank actually and reasonably relied upon the credit application to its detriment and that such reliance resulted in the complained of loss.

### 6.

For the aforementioned reasons, the court concludes that First International Bank has proven by a fair preponderance of the evidence all the requisite elements necessary to support the denial of discharge under § 523(a)(2)(B). Accordingly, the court need not consider whether the plaintiff's prayer for relief under § 523(a)(2)(A) or § 523(a)(2)(C) should be granted.

### 7.

■ The plaintiff-creditor requests recovery of costs and attorney's fees associated with bringing the instant adversary proceeding under § 523(d) of the Bankruptcy Code. Section 523(d) provides:

> If a creditor requests a determination of dischargeability of a *consumer debt* under subsection (a)(2) of this section, and such debt is discharged, the court shall grant judgment *in favor of the debtor* for the costs of, and a reasonable attorney's fee for, the proceeding if the court finds that the position of the creditor was not substantially justified, except that the court shall not award such costs and fees if special circumstances would make the award unjust.

11 U.S.C. § 523(d) (emphasis added). From the foregoing, it is clear that § 523(d) is applicable only to *consumer debts* under § 523(a)(2). "Consumer debt" is defined under the Code as "debt incurred by an individual primarily for a personal, family, or household purpose". 11 U.S.C. § 101(8). The uncontroverted testimony in the instant case revealed that the credit card indebtedness was incurred predominantly in connection with business-related expenses. As such, the debt is not of a type for which a § 523(d) award may be recovered.

■ Notwithstanding the aforementioned discussion which centers on the definitional prerequisite to the establishment of a § 523(d) recovery, the Bankruptcy Code does not expressly award costs and attorney's fees to a *creditor* who successfully contests the dischargeability of its claim. Moreover, the legislative history of § 523(d) reveals that the congressional failure to award attorney's fees to prevailing creditors was purposeful:

> The threat of litigation over this exception to discharge and its attendant costs are often enough to induce the debtor to settle for a reduced sum, in order to avoid the costs of litigation. Thus, creditors with marginal cases are usually able to have at least part of their claim excepted from discharge (or reaffirmed), even though the merits of the case are weak.

> \*   \*   \*   \*   \*   \*

> In order to balance the scales more fairly in this area, H.R. 8200 adopts a compromise. The false financial statement exception is retained, and the creditor, as under current law, is required to initiate proceedings to determine if the debt is nondischargeable. If the debtor prevails, however, the creditor is taxed costs and attorney's fees, and may be taxed any actual pecuniary damages, such as a loss of a day's work, that the debtor may have suffered as a result of the litigation. The present pressure on the honest debtor to settle in order to avoid attorney's fees in litigation over a creditor-induced false statement is eliminated. The creditor is protected from dishonest debtors by the continuance of the exception to discharge.

> *The bill does not award the creditor attorney's fees if the creditor prevails.* Though such a balance might seem fair at first blush, such a provision would restore the balance back in favor of the creditor by

inducing debtors to settle no matter what the merits of their cases. In addition, the creditor is generally better able to bear the costs of litigation than a bankrupt debtor, and it is likely that a creditor's attorney's fees would be substantially higher than a debtor's, putting an additional disincentive on the debtor to litigate. H.R.Rep. No. 595, 95th Cong., 2d Sess. at 131, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 6092 (emphasis added). *See also* 3 *Collier on Bankruptcy*, ¶ 533.12 at 523-80-83 (15th ed. 1993).

From a reading of the Bankruptcy Code's plain language coupled with the legislative history that surrounds § 523(d), it is readily apparent that there is no statutory basis for an award for costs or attorney's fees to the creditor in this case.[5]

## CONCLUSION

All elements of First International Bank's complaint for nondischargeability under § 523(a)(2)(B) of the Bankruptcy Code have been satisfied. Accordingly, IT IS ORDERED that judgment be entered in favor of First International Bank, and against the debtors David and Mary Kerbaugh, in the sum of $3,538.23 said sum representing the outstanding prepetition indebtedness being nondischargeable in bankruptcy.[6]

First International Bank's request for costs and attorney's fees under § 523(d) of the Bankruptcy Code is in all things DENIED.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

---

5. The statutory silence with respect to costs and attorney's fees to a successful creditor in a dischargeability proceeding may not necessarily preclude recovery if there exists a separate contractual basis for such an award. *See, e.g., Transouth Fin. Corp. v. Johnson*, 931 F.2d 1505, 1509 (1991) (holding that attorney's fees may be recovered in a dischargeability proceeding when they are provided for in an enforceable agreement). The complaint and evidence presented in the instant case is completely devoid of any averment regarding the existence of a contractual basis for an award of costs or attorney's fees.

6. *Due in part to the variable rate of interest, the court was unable to calculate the exact amount of interest on the outstanding prepetition balance. Accordingly, the calculated indebtedness is an approximation based upon the following:* Plaintiff's Exhibit 1—Visa Statement—1/12/93 closing date—$3,130.89 (Previous Balance) + $395.68 (New Activity) − $31.68 (Postpetition Purchase) = $3,494.89 (Balance) × .0124 (Periodic Interest Rate) = 43.34 (Total Interest) + $3,494.89 (Balance) = $3,538.23 aggregate prepetition indebtedness.