**F I L E D**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

In re: ROY CRIBBS,

　　　　Debtor,

------------------------

FIRST NATIONAL BANK,

　　　　Plaintiff-Appellant,

　v.

ROY CRIBBS,

　　　　Defendant-Appellee.

No. 05-6225
(BAP No. WO-05-012)
(BAP)

**ORDER AND JUDGMENT**[*]

Before **LUCERO**, **EBEL**, and **MURPHY**, Circuit Judges.

　　　　Plaintiff First National Bank ("FNB") appeals from a decision of the United

States Bankruptcy Appellate Panel of the Tenth Circuit ("BAP"). The BAP

---

[*]　　　　After examining the briefs and appellate record, this panel has determined
unanimously to grant the parties' request for a decision on the briefs without oral
argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and
collateral estoppel. The court generally disfavors the citation of orders and
judgments; nevertheless, an order and judgment may be cited under the terms and
conditions of 10th Cir. R. 36.3.

affirmed a decision by the bankruptcy court that a debt defendant Roy Cribbs owed to FNB was dischargeable in Mr. Cribbs's Chapter 7 bankruptcy proceeding. Exercising jurisdiction pursuant to 28 U.S.C. § 158(d), we affirm.

I.

In 1999, Cribbs, acting on behalf of Purcell Assisted Living, Inc. ("PALI"), and working with a mortgage broker, Everett Cox, applied for a construction loan from FNB to finance an assisted living center project in Purcell, Oklahoma ("Purcell Project"). Cribbs did not have a relationship with FNB at this time. He submitted a financial statement to FNB ("April 1999 Statement"), which does not appear to be part of the record. FNB rejected his application because he did not have adequate liquid assets.

In March 2000, Cribbs obtained two additional investors, Cox and Terry Poole, whose personal financial statements showed significant liquidity and net worth. Cribbs applied again for a loan from FNB and submitted a second financial statement dated March 1, 2000 ("March 2000 Statement"), although his signature and that of Cox, who witnessed the statement, were dated April 26, 1999. The March 2000 Statement purported to be a joint statement by Cribbs and his wife, but his wife never signed it. FNB never inquired about the dates and never asked Mrs. Cribbs about the statement or to sign it. Most of the listed assets in fact were held either by one of Cribbs's closely-held businesses or by his wife's trust. One of those assets that FNB contends was not listed on the April

-2-

1999 Statement was a promissory note in the amount of $483,630 ("Note") that Cribbs claimed one of his closely-held businesses, Phoenix Health Services, Inc. ("Phoenix"), owed to him on another assisted living center project in Mustang, Oklahoma ("Mustang Project"). However, there was no Note. Instead, the listing represented the profit Cribbs anticipated on completion of the Mustang Project. Cribbs also orally represented that he would contribute the proceeds from the Mustang Project to the Purcell Project, and he omitted from the March 2000 Statement the fact that Phoenix owed his wife's trust $600,000.

During the loan approval process, Suzi Mack, an FNB vice president, performed a credit analysis by comparing Cribbs's financial statement with information from other companies similar to PALI. Robert Bishop, a commercial bank officer at FNB, reviewed the prospectus for the Purcell Project and toured another PALI project. He also inspected the Mustang Project. When he contacted the bank handling the Mustang Project loan, he learned that Phoenix was current on its obligations. Bishop never asked to see the Note, and FNB never attempted to take a security interest in or an assignment on the Note.

Ultimately, FNB extended a construction loan to PALI in November 2000 for $2,838,903.94, on which Cribbs and his two co-investors executed personal guaranties. FNB extended a second loan to PALI in the amount of $101,050 for fixtures and equipment, on which Cribbs executed a personal guaranty. When

PALI defaulted on both loans, Cribbs and the other investors refused to honor their guaranties.

In January 2003, FNB obtained a judgment against Cribbs on both loans in Oklahoma state court.  In March 2004, Cribbs filed a petition in the bankruptcy court under Chapter 7.  FNB then initiated an adversarial proceeding to have the debt excepted from discharge under 11 U.S.C. § 523(a)(2)(B).  After a trial, the bankruptcy court held that the debt was dischargeable because FNB failed to establish that (i) it actually and reasonably relied on the March 2000 Statement and (ii) Cribbs acted with intent to deceive.  The BAP affirmed, and FNB appeals.

## II.

"On appeal from BAP decisions, we independently review the bankruptcy court's decision."  Lampe v. Williamson (In re Lampe), 331 F.3d 750, 753 (10th Cir. 2003).  "[W]e review the bankruptcy court's legal determinations de novo and its factual findings under the clearly erroneous standard."  Conoco, Inc. v. Styler (In re Peterson Distrib., Inc.), 82 F.3d 956, 959 (10th Cir. 1996).  A factual finding "is clearly erroneous if it is without factual support in the record or if, after reviewing all of the evidence, we are left with the definite and firm conviction that a mistake has been made."  Id.  As discussed in detail below, FNB argues on appeal that the bankruptcy court misapplied the legal standards or applied the wrong legal standards and, therefore, its factual findings are clearly erroneous.

-4-

When an individual debtor files for bankruptcy protection under Chapter 7, a court generally discharges all of the debtor's pre-existing obligations. See 11 U.S.C. § 727. Some debts obtained by fraud, however, cannot be discharged. The relevant statute provides that a discharge under Chapter 7 does not discharge a monetary debt that is obtained by use of a written statement

> (i) that is materially false;
> (ii) respecting the debtor's or an insider's financial condition;
> (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
> (iv) that the debtor caused to be made or published with intent to deceive[.]

11 U.S.C. § 523(a)(2)(B). FNB must establish each element by a preponderance of the evidence. See Leadership Bank, N.A. v. Watson (In re Watson), 958 F.2d 977, 978 n.2 (10th Cir. 1992). Cribbs conceded that his personal financial statement contained materially false representations about his financial condition. Thus, FNB's arguments concern the third and fourth elements of the statute.

As to the third element, a creditor must show that it actually relied on the financial statement and that its reliance was reasonable. Field v. Mans, 516 U.S. 59, 68 (1995). FNB argues that the bankruptcy court applied a newly formulated "most substantial factor" or "only substantial factor" test when it found that FNB's decision to extend the loans to PALI was more likely based on the presence of the new guarantors. FNB urges that, in order to show actual reliance, it need not show that the financial statement was the only influential factor or

even the most substantial factor, but only that its reliance on the financial statement was "a contributory cause of the extension of credit and that credit would not have been granted if the lender had received accurate information," First Int'l Bank v. Kerbaugh (In re Kerbaugh), 162 B.R. 255, 264 (Bankr. D.N.D. 1993) (quotations omitted).

This circuit has held that "§ 523(a)(2)(B) does not require that a creditor rely exclusively on the false financial statement. Partial reliance is enough." Cent. Nat'l Bank & Trust Co. v. Liming (In re Liming), 797 F.2d 895, 897-98 (10th Cir. 1986) (citation omitted). Relying in part on In re Liming, this circuit has explained that "a debt is obtained by fraud if the fraud is a substantial factor in the creditor's decision." John Deere Co. v. Gerlach (In re Gerlach), 897 F.2d 1048, 1052 (10th Cir. 1990) (quotation omitted). Thus, partial reliance on a financial statement is adequate if it is substantial, even if the financial statement is not the most substantial factor. Whether the claimed partial reliance is actual, however, is not necessarily distinct from the reasonableness inquiry, as "reasonableness goes to the probability of actual reliance." Field, 516 U.S. at 76 (discussing whether reasonable or justifiable reliance is required under 11 U.S.C. § 523(a)(2)(A)).

The bankruptcy court found that FNB's "final decision to make the loan to PALI was substantially based on the guaranties provided by Cox and Poole." Aplt. App. at 129, ¶ 4. The court noted that, despite insisting that the decision to

extend the loans was based on the Note, FNB never even asked to see the Note or to take an assignment on it. Id. at 133, ¶ 13. The court found "unconvincing" FNB's argument that the loan decision "was based on [Cribbs's] financial condition, namely the $483,000 note. Rather, . . . a more significant factor . . . was the inclusion of new guarantors with substantial net worth." Id., ¶ 14 (emphasis added). The court also found that FNB "did not actually rely on [Cribbs's] representation that he was owed $483,000, in making its final decision to make the loan. Instead, . . . [FNB's] decision was more likely based on the additional guarantors." Id. at 133-34, ¶ 15 (emphasis added).

FNB's argument that the bankruptcy court improperly weighed any reliance on the March 2000 Statement against FNB's reliance on the additional guarantors, rather than determine if reliance on the financial statement was in and of itself substantial, is largely based on the emphasized language in the foregoing quotations. Although that language, viewed in isolation, supports FNB's argument, consideration of the court's decision as a whole indicates otherwise.

The bankruptcy court held that FNB did not "actually rely" on the March 2000 Statement because the addition of the new guarantors resolved FNB's concerns about Cribbs's lack of adequate liquid capital, which was the reason FNB denied his first loan application. Id. at 139. The court continued: "It is difficult to believe [FNB's] assertion that its change in position was not based on the additional guarantors but instead on the $483,000 purportedly owed to

-7-

[Cribbs]." Id. Read in conjunction with the court's finding that FNB never even asked to see the Note, it is evident that the court did not determine that, of two substantial bases for reliance, FNB's reliance on the new guarantors was the more substantial. Rather, the court determined that there was no actual reliance, and thus no substantial reliance, on the March 2000 Statement because the claimed reliance on the Note was unreasonable.

This, however, does not end our inquiry. We must next consider whether FNB's claimed reliance on the March 2000 Statement was unreasonable. Reasonableness must be "evaluated according to the particular facts and circumstances present in a given case." First Bank v. Mullet (In re Mullet), 817 F.2d 677, 679 (10th Cir. 1987), abrogated on other grounds by Field, 516 U.S. at 74-75. Relevant factors a court must consider include the creditor's standard lending practices, the standard in the creditor's industry, and the surrounding circumstances at the time the debtor applies for credit, including whether there are any "red flags" in the application, whether there was an ongoing business relationship, and whether further investigation would have revealed inaccuracies in the debtor's application. Ins. Co. of N. Am. v. Cohn (In re Cohn), 54 F.3d 1108, 1117 (3d Cir. 1995); In re Mullet, 817 F.2d at 681.

Relying on a number of cases, FNB emphasizes that, absent "other factors," a creditor's reliance on a financial statement is reasonable if it follows its own standard lending practices. See In re Cohn, 54 F.3d at 1117; Gertsch v. Johnson

& Johnson, Fin. Corp. (In re Gertsch), 237 B.R. 160, 170 (B.A.P. 9th Cir. 1999); Peoples Thrift Sav. Bank v. Larrieu (In re Larrieu), 230 B.R. 256, 265 (Bankr. E.D. Pa. 1999); In re Kerbaugh, 162 B.R. at 265. Although we generally agree, we conclude that one of the "other factors" that might render a creditor's adherence to its own standard lending practices insufficient for purposes of establishing reasonable reliance is a lack of ordinary diligence under the particular facts of the case. See Norwest Card Servs. v. Barnacle (In re Barnacle), 44 B.R. 50, 54 (Bankr. D. Minn. 1984) (holding that reliance is reasonable "if a creditor's actual conduct followed its normal business practices and/or standards in the industry and if the creditor, upon the particular facts acted with ordinary diligence" (emphasis added)).

Although not explicitly stating that it was requiring ordinary diligence, a close reading of the bankruptcy court's decision indicates that it was, in large part, FNB's lack of any diligence as to the Note itself that rendered reliance on the March 2000 Statement too unreasonable to constitute reliance in fact. The court noted that FNB had never done business with Cribbs before. The court considered the testimony of Ms. Mack, the FNB vice president who conducted a credit analysis, that it is FNB's policy never to request evidence to support customer representations on financial statements, and that it was not incumbent on FNB to investigate the Note because FNB was not taking an assignment of it. It is apparent the court found FNB's adherence to its own policy insufficient to

protect it given the facts of this case. The court also recognized that FNB investigated two of Cribbs's other projects and called the bank handling the loan on the Mustang Project to see how that loan was performing. It is clear, however, that these steps were not aimed at verifying the existence of the Note.

Under the particular facts of this case, where the Note listed on the financial statement accompanying Cribbs's second loan application addressed the reason FNB had denied his first application, FNB should have undertaken at least a minimal investigation into the legitimacy of the Note in order to show ordinary diligence. That investigation could have involved as little as reviewing a copy of the Note, which would not have been too burdensome on FNB. Certainly it would not have required FNB to verify every representation in the March 2000 Statement. Requesting to see a copy of the Note might not have revealed that Phoenix, Cribbs's company that purportedly held the fictitious Note, owed Mrs. Cribbs's trust $600,000, but it likely would have demonstrated that there was no Note.[1]

In requiring a creditor to exercise ordinary diligence under the circumstances of a particular loan application, we do not suggest an affirmative

---

[1]    To the extent FNB claims also to have relied on Cribbs's oral representation that he would contribute the profit on the Mustang Project to the Purcell Project, the exception to discharge FNB invoked in this case, 11 U.S.C. § 523(a)(2)(B), applies only to materially false written statements and, therefore, does not protect FNB. See In re Mullet, 817 F.2d at 679 (noting that reliance on oral representations is covered by 11 U.S.C. § 523(a)(2)(A)).

-10-

duty to investigate in every circumstance. What constitutes ordinary diligence sufficient to support a finding of reasonable reliance is to be determined according to the particular facts of each case. In some instances, it may not require any investigation at all. See Mgmt. Jets Int'l, Inc. v. Mutschler (In re Mutschler), 45 B.R. 482, 493 (Bankr. D.N.D. 1984) (explaining that creditors "are entitled to rely on [a written financial] statement as being an accurate representation of what it purports to be as long as fraud is not apparent from the document itself"). In this case, however, even though fraud as to the Note was not apparent from the March 2000 Statement itself, FNB did not exercise ordinary diligence because the Note was the asset that distinguished the March 2000 Statement from the April 1999 Statement and purportedly was central to FNB's decision to extend the loans after its rejection of Cribbs's first loan application.

FNB also argues that the absence of Mrs. Cribbs's signature and the gap between the signature date, April 26, 1999, and the "date of statement," March 1, 2000, were not the type of "red flags" indicative of inaccurate or unreliable financial information in the statement that ordinarily require a creditor to conduct a more thorough investigation. We need not address this argument because the deficient investigation of the Note was a sufficient basis for the bankruptcy court's determination that FNB's purported reliance on the Note (and therefore the March 2000 Statement) was unreasonable even without reference to the "red flags."

FNB contends that the bankruptcy court committed legal error by ignoring uncontroverted evidence that neither FNB nor anyone in the industry verifies (i) the ownership of real property listed on a financial statement unless the property is being used as collateral or (ii) the amount of money held in checking accounts listed on financial statements. These points are immaterial. The court did not discuss FNB's internal standards or industry standards concerning title checks and bank balances because they were not relevant to its holding. The court emphasized FNB's failure to verify the debt represented by the Note. We concluded above that FNB's contention that it followed its own standards was insufficient as to the Note under the facts of this case. Furthermore, FNB presented no evidence of the industry standards concerning the factual scenario present here, namely, when a new asset listed on a second financial statement addresses the very shortcoming in a loan applicant's earlier financial statement.

In sum, we conclude that the bankruptcy court's findings are not "without factual support in the record," and we are not "left with the definite and firm conviction that a mistake has been made." In re Peterson Distrib., Inc., 82 F.3d at 959. We further conclude that the court committed no legal error. Because FNB has failed to meet its burden as to the third element of § 523(a)(2)(B), the exception to discharge does not apply, and we need not consider whether FNB met its burden as to the fourth element, intent to deceive.

The judgment of the United States Bankruptcy Appellate Panel of the Tenth

Circuit affirming the judgment of the bankruptcy court is **AFFIRMED**.


Entered for the Court


Carlos F. Lucero
Circuit Judge