**In re Franklin Leo BOHR, Jr., and Sharolyn Ann Bohr, d/b/a Bohr's New and Used, Debtors.**

**The Heritage Bank of St. Joseph, Plaintiff,**

v.

**Franklin Leo Bohr, Jr., and Sharolyn Ann Bohr, d/b/a Bohr's New and Used, Defendants.**

**Bankruptcy No. 01–50446–JWV. Adversary No. 01–05015–JWV.**

United States Bankruptcy Court, W.D. Missouri, St. Joseph Division.

Nov. 28, 2001.

**164**

John L. Manring, St. Joseph, MO.

Robert B. Miner, Watkins Boulware Lucas Miner Murphy & Taylor, St. Joseph, MO.

## MEMORANDUM OPINION AND ORDER

JERRY W. VENTERS, Bankruptcy Judge.

This adversary proceeding comes before the Court on The Heritage Bank of St. Joseph's (the "Bank") Complaint to Determine the Dischargeability of Debts under 11 U.S.C. § 523(a)(2)(B). The Court held a trial on this matter at the Buchanan County Courthouse in St. Joseph, Missouri, on November 8, 2001. At the close of the trial, the Court announced that it would take the matter under advisement and gave counsel ten days to submit legal arguments. Both attorneys have submitted writings to the Court on the legal issues. The Court has reviewed these documents in addition to the pleadings, relevant caselaw, the stipulated facts, and the evidence adduced at trial and is now ready to rule.

For the reasons set out herein, the Court finds that the Debtors intended to deceive the Bank in providing blatantly false financial statements to the Bank and that the Bank reasonably relied on those false financial statements when extending credit. Therefore, the debts are nondischargeable and the Court will grant the relief requested on all five Counts of the Complaint representing five different promissory notes.

This Memorandum Opinion and Order constitutes the Court's Findings of Fact and Conclusions of Law as required by Federal Rule of Bankruptcy Procedure 7052. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) and (J), and the Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334.

### FACTUAL BACKGROUND

The Debtors, Franklin L. Bohr, Jr. and Sharolyn A. Bohr, (the "Debtors") were

engaged in a business that sold small trailers and vehicles. Over the course of several years, the Debtors borrowed money from the Bank to finance their business. The trailers and vehicles that made up the business inventory served as collateral for the various loans the Debtors obtained from the Bank. In connection with their loans, the Debtors provided annual financial statements to the Bank, and indicated in those financial statements that they owned a 250–acre tract of real estate in Buchanan County, Missouri. The Debtors resided on this property with Franklin Bohr's mother, Dorothy B. Bohr, and operated their business from that location. It is the listing of this real estate on the financial statements given to the Bank that has spawned this litigation and brings us to this point.

At issue in this Adversary Proceeding are five promissory notes on which the total outstanding balance was $104,234.75 on May 25, 2001, the date the bankruptcy was filed.[1] On the financial statements given to the Bank,[2] the Debtors listed their residence at 12027 U.S. Highway 36, Easton, Missouri, as property that they owned free and clear of all liens and encumbrances. Typically, the Debtors listed the owners of the real estate as "Frank & Sharolyn," an obvious reference to themselves. They did not indicate that any other person had an ownership interest in or control over the property, although the Bank's forms provided that a check mark should be used to indicate "if Others have an Ownership Interest." All of the financial statements executed prior to 1999 listed the value of the property as $250,000.00; this value was increased to $262,000.00 on the 1999 financial statement.

The Debtors were established customers of the Bank and, prior to 2000, had apparently never had any trouble meeting their obligations to the Bank. However, in late 2000, the Bank's senior loan officer and an executive vice president, George K. Skinner ("Skinner"), who had been the Debtors' primary loan officer and had known the Debtors for some 20 years, drove by the Debtors' farm property and noticed that the trailer and vehicle inventory was low.[3] Skinner became concerned about the repayment of the Bank's notes and asked Franklin Bohr to come to the Bank for a meeting. At that meeting, in November 2000, Franklin Bohr admitted to Skinner that he was having financial trouble and told Skinner that he would sell 40 acres of the farm property to bring his notes current or pay them in full.[4] When

---

1. The Debtors borrowed from the Bank on five separate promissory notes dated July 13, 2000, in the amount of $16,554.99; October 10, 2000, in the amount of $6,526.85; October 23, 2000, in the amount of $20,447.93; December 4, 2000, in the amount of $6,562.85; and December 5, 2000, in the amount of $50,000.00.

2. The Stipulation of Facts submitted by the parties indicates seven personal financial statements (referred to as "financial statements"), dated December 6, 1999, November 16, 1998, December 9, 1997, November 5, 1996, November 9, 1995, October 24, 1994, and July 16, 1993. All of the financial statements were admitted into evidence without objection by Debtors.

3. Although the Bank's records indicated that there were approximately 40 trailers in inventory. Skinner found that there were far fewer than that at the business. According to the state court lawsuit filed later by the Bank against the Debtors, Franklin Bohr provided a listing to the Bank in December 2000 indicating that the Debtors had only seven trailers in inventory at that time, with a value of $20,720.00.

4. Franklin Bohr never told Skinner that he didn't have the power or ability to sell the land. In fact, Franklin Bohr testified, he asked his mother if she would agree to sell some of the real estate and she adamantly refused, saying she would never sell the land.

the promised payment was not forthcoming, Skinner went to the Debtors' residence in late January 2001 to inquire about payment. At that time, Sharolyn Bohr told Skinner for the first time that the Debtors did not own the real estate and that it was not theirs to sell.

The Bank apparently undertook an immediate investigation and learned that the real estate was actually titled in the names of the Debtors and Franklin Bohr's mother and that Dorothy B. Bohr, Franklin's mother, had a life estate in the property with full power to sell, transfer, or encumber the property during her lifetime.[5] Shortly thereafter, in March 2001, the Bank filed suit against the Debtors in the Buchanan County Circuit Court, seeking a judgment on the promissory notes and also seeking replevin of the remaining collateral. Before that matter could go to trial, the Debtors filed their voluntary Chapter 7 petition in this Court on May 25, 2001.

The Debtors' bankruptcy schedules listed the Bank as a secured creditor and listed the debt owed to the Bank on the five outstanding promissory notes as $104,234.75. Various items of shop equipment and seven trailers, having a total value of just $21,515.00, were shown as collateral for the notes. Quite properly, the real estate was not listed as collateral for the notes. The Debtors' Amended Schedule A listed their interest in the real estate as "remainder interest in property known as 12027 U.S. Highway 36, Easton, Missouri, life estate in mother Dorothy

Pearson" and listed the current market value of their interest as "$0.00."

Subsequently, on August 17, 2001, the Bank initiated this Adversary Proceeding.

## DISCUSSION

The Bankruptcy Code bars discharge of debts in Chapter 7 cases if money was obtained by a false financial statement. Section 523(a)(2)(B) states in pertinent part:

(a) A discharge under section 727 ... does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with the intent to deceive ...

11 U.S.C. § 523(a)(2)(B).

Under § 523(a)(2)(B), the Bank must prove every element by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 286–87, 111 S.Ct. 654, 659–60, 112 L.Ed.2d 755 (1991). If the creditor fails to meet its burden, the debt is dis-

---

This conversation was never communicated to Skinner.

**5.** The General Warranty Deed that created the life estate was executed in January 1975. It provided: "Franklin L. Bohr and Dorothy B. Bohr, his wife, [Debtor Franklin Bohr's parents] shall have an estate for their lives with full power to sell, convey, mortgage, rent, option, lease or dispose of the fee title to said realty and to use and consume the proceeds

of any such transaction. The remainder interest in said realty, subject to the Life Estates and all of the powers granted to the Life Tenants, shall belong to Franklin L. Bohr, Jr. and Sharolyn A. Bohr, his wife." The father died in 1979, and Dorothy Bohr has apparently remarried and has the last name of Pearson. However, she will be referred to as "Dorothy Bohr" in this opinion.

chargeable. *Valley Nat. Bank v. Bush (In re Bush)*, 696 F.2d 640, 644 n. 4 (8th Cir.1983). In this case, the Bank must establish that (1) the debtor made (2) a statement in writing (3) respecting the debtor's financial condition (4) that was materially false and (5) that was made with the intent to deceive and (6) that was reasonably relied upon by the Bank. *Meyer v. Dygert (In re Dygert)*, 2000 WL 630833, *5 (Bankr.D.Minn.2000).

There is no dispute that the Bank has satisfied the first three elements. The Debtors stipulated and testified that they signed all of the financial statements which they provided to the Bank, and the financial statements offered into evidence are indisputably statements of their financial condition.[6] The Debtors further stipulated that the debts incurred "represent extensions of loans or credit, renewals of loans or credit, or refinancing of loans or credit from Bank to Defendants for business purposes." Therefore, the Court finds that the Bank has met its burden on the first three elements. However, the Debtors dispute that the Bank has carried its burden on the three remaining elements.

▋ The first of these is whether the financial statements are materially false. A financial statement is materially false if it "paints a substantially untruthful picture of a financial condition by a misrepresentation of the type which would normally affect the decision to grant credit." *Dygert* at *21. A financial statement is also materially false if it falsely represents the overall financial condition of the Debtor or has major omissions. *Capital City Bank & Trust v. Kroh (In re Kroh)*, 88 B.R. 987, 994 (Bankr.W.D.Mo.1988). In the present case, the Debtors listed real estate valued at $250,000.00 (later increased to $262,000.00) but did not indicate that they owned the property with Dorothy Bohr, Franklin Bohr's mother, or that Dorothy Bohr had a life estate in the property with full power to sell or encumber it. The misrepresentation occurred when the Debtors failed to indicate on the financial statements that they did not actually own the property but merely had an expectancy of ownership upon the death of Franklin Bohr's mother. The Debtors admitted that it was wrong to represent that they owned the land when in fact their interest was subject to a life estate. The Debtors also admitted that in their written financial statements they represented that they were the only owners of the real estate and did not indicate that Franklin Bohr's mother was a life tenant of the real estate. The Debtors also stipulated that they knew that they were not the sole owners of the real estate as they had indicated on their financial statements and that their interest had no value. In other words, the Debtors knew at the time they gave the financial statements to the Bank that they were false. And clearly, the misrepresentations were material. For instance, on the financial statement dated December 6, 1999, the Debtors' net worth was shown as $270,042.00. Without the $262,000.00 value in real estate, the Debtors' net worth would have been just $8,042.00. The same is true for all of the other financial statements—the real estate made up the vast majority of the Debtors' net worth. The inclusion of the real estate vastly overstated the Debtors' net worth and gave the Bank a grossly distorted and inaccurate picture of the Debtors' financial condition. In fact, if the real estate was not included on the financial statements, the Debtors had almost no net worth. The Court finds that the Debtors' inclusion of the real estate, valued at $250,000.00 and later at

---

**6.** Each financial statement includes a statement immediately above the Debtors' signatures that this is a "statement of our financial condition."

$262,000.00, makes the financial statements materially false in that they paint a dramatically untruthful picture of the Debtors' financial condition.

The Court next turns its focus to whether the Bank's reliance on the financial statements was reasonable. With respect to the Bank's reliance, the testimony and Stipulation of Facts offer substantial evidence that the Bank actually relied on the financial statements in making the loans to the Debtors. The issue in this case is whether that reliance was reasonable. The determination of reasonableness is based upon the totality of the circumstances. *First National Bank of Olathe v. Pontow*, 111 F.3d 604 (8th Cir. 1997). The Eighth Circuit in *Pontow* set forth factors that courts may consider in their analysis of whether a lender acted reasonably or had a duty to investigate. The first factor is whether any "red flags" were present that would have alerted an ordinarily prudent lender to the possibility that the financial statements relied upon were not accurate. *Id.* Secondly, a court may inquire whether minimal investigation would have revealed the false representations. *Id.* The Debtors argue that the Bank should have known that the real estate listed was subject to a life estate and that it had a duty to investigate. Sharolyn Bohr insisted that she had told Skinner in the past that they did not own the real estate; however, she could not recall when or where this conversation occurred, and Skinner denied that it had ever taken place. Franklin Bohr indicated that he thought he had written the words "life estate" on a financial statement, but he was unable to recall when this might have occurred and whether the Bank actually received a copy of that financial statement with the notation. The Court finds that the Bank had no indication that the Debtors did not own the property until

Sharolyn Bohr so informed Skinner when he came to her residence in January 2001, and that up to that time the Bank had no reason or duty to investigate the title to the property. David Lewis, executive vice president and loan officer for the Bank, testified that there was no reason to verify the ownership of the asset because it was not being pledged as collateral for the note; it was considered a secondary source of repayment. He believed that the Debtors owned the property and he had no indication that they did not own it. Another loan officer, Marcus Tyrell, testified that he looked at the financial statements to determine whether the Debtors were "worthy of the credit;" since the Debtors were established customers of the Bank, he saw no reason to re-verify information on the statements. According to Tyrell, there was nothing to indicate that the Debtors never owned the real estate, and it was the Bank's practice not to verify an asset if the asset was not pledged. The Bank officers all testified that if they had known that the Debtors merely had a remainder interest in the real estate and not full ownership as they represented in the financial statements, the Bank would not have made the loans it did to the Debtors. The Court finds substantial evidence that the Bank reasonably relied on the financial statements of the Debtors in evaluating their creditworthiness and extending loans for their business operations. The Court agrees with the Bank that a creditor is not required to assume that a debtor is lying or misrepresenting facts in the financial statement, which seems to be the argument the Debtors are making. *Miller v. Boles (In re Boles)*, 150 B.R. 733, 740 (Bankr.W.D.Mo.1993). While a minimal investigation would most likely have revealed the true ownership of the real estate and thereby exposed the falsity of the financial statements, there were no "red flags" for the Bank that would have trig-

gered such an investigation until Sharolyn Bohr told the Bank for the first time, in January 2001, that the Debtors did not own the property by themselves. When it received that information, the Bank undertook an immediate investigation, learned the truth, and filed suit against the Debtors in state court.

 Finally, the last element is whether the Debtors had the intent to deceive the bank. An intent to deceive does not mean that the Debtors acted with a "malignant heart." *Agribank v. Webb (In re Webb)*, 256 B.R. 292, 297 (Bankr. E.D.Ark.2000). Knowledge of the falsity of the information or reckless disregard for the truth satisfies the intent element of § 523(a)(2)(B). *Id.* The Debtors subjectively intended to deceive the Bank each time they submitted a financial statement that they knew was false as to the ownership of the real estate. Although both Debtors testified that they did not intend to deceive the bank, that testimony is simply not credible. Once the creditor establishes that the debtor had actual knowledge of the false statement, the debtor cannot overcome the inference of the intent to deceive with unsupported assertions of honest intent. *Id.* The Debtors both testified under oath and agreed in the Stipulation of Facts that they knew at the time they signed the financial statements that they did not own the property as described in the financial statements. The Debtors by their own admissions knew that the land would not be theirs until Franklin Bohr's mother's death. The Debtors also admitted they knew that the Bank would rely on the financial statements to make a decision on whether to extend the loans.[7] The Court finds in the Stipulation of Facts and the Debtors' testimony that the Debtors knew the statement was false when they were applying for the

loans or for extensions thereof and may infer from that that they intended to deceive the Bank. *Boles*, 150 B.R. at 741. No other justification has been offered for such blatantly false statements. Clearly, the Debtors sought to deceive the Bank—and did, in fact, succeed in deceiving the Bank—as to the true ownership of the real estate and the value of their interest in that real estate for the purpose of obtaining loans or extensions of loans.

In summary, the Bank has met its burden to prove every element of § 523(a)(2)(B). The Debtors made a false statement in writing to obtain credit from the Bank. There is no question that the Debtors knew the financial statements were false. The Debtors, by their own admissions, knew that they did not own the real estate and that the Bank was relying on the financial statements in making its decision to extend credit. The Bank reasonably relied on the false financial statements—there was no "red flag" or warning given to the Bank that imposed a duty to investigate further.

 In addition, the Bank has requested that it be awarded reasonable attorneys' fees and its costs. Pursuant to a contractual fee provision in each of the promissory notes signed by the Debtors, they agreed to pay all reasonable attorneys' fees and costs in connection with collection of the debt. The Court finds the attorneys' fees and costs in the amount of $13,210.21 submitted by the Bank to be reasonable, and the Debtors will be ordered to pay the attorneys' fees and costs as agreed.

Therefore, for the reasons stated herein, it is

**ORDERED** that the Debtors, Franklin L. Bohr, Jr. and Sharolyn A. Bohr, be and are hereby denied discharge pursuant to

---

**7.** While the Court admires their candor, unfortunately for the Debtors their candor removes all doubt that the debts owed the Bank must be found to be nondischargeable.

11 U.S.C. § 523(a)(2)(B) on all five of the promissory notes enumerated in Plaintiff's Complaint, Counts I through V, and the Clerk of the Court shall enter judgment in favor of the Plaintiff, The Heritage Bank of St. Joseph, and against the Debtors, Franklin L. Bohr, Jr. and Sharolyn A. Bohr, as follows: Count I—$16,203.60, plus contractual interest at the rate of 13.5% per annum from May 25, 2001. Count II—$7,019.73, plus contractual interest at the rate of 12.5% per annum from May 25, 2001. Count III—$21,830.99, plus contractual interest at the rate of 13% per annum from May 25, 2001. Count IV—$6,890.55, plus contractual interest at the rate of 12.5% per annum from May 25, 2001. Count V—$52,289.88, plus contractual interest at the rate of 12.5% per annum from May 25, 2001. It is

**FURTHER ORDERED** that the costs of this proceeding be and are hereby taxed to the Debtors, Franklin L. Bohr, Jr. and Sharolyn A. Bohr, and the Plaintiff is awarded attorneys' fees in the amount of $13,210.21.