284 B.R. 876 (2002)
Joe Layne McCLEARY, Kimberly Kay McCleary dba Quality "1" Construction, Debtors.
Fairfax State Savings Bank, Plaintiff,
v.
Joe Layne McCleary, Defendant.
Bankruptcy No. 01-02003C. Adversary No. 01-9178C.
United States Bankruptcy Court, N.D. Iowa.
August 28, 2002.
*877 *878 *879 *880 Thomas G. McCuskey, Cedar Rapids, IA, for Plaintiff.
Michael L. Mollman, Cedar Rapids, IA, for Debtors/Defendant.

ORDER
PAUL J. KILBURG, Chief Judge.
On June 27, 2002, the above-captioned matter came on for trial. Plaintiff Fairfax State Savings Bank appeared through its loan officer Kevin Slater, with Attorneys Thomas McCuskey and Jonathan Kopecky. Debtor Joe Layne McCleary appeared with Attorney Michael Mollman. Evidence was presented after which the Court took the matter under advisement. The deadline for the filing of briefs has now passed and this matter is ready for resolution. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

STATEMENT OF THE CASE
Debtor/Defendant filed a Chapter 7 petition on June 4, 2001 in which Fairfax State Savings Bank (the "Bank") was listed as a creditor. On August 3, 2001, the Bank filed the pending complaint to determine dischargeability of a debt owed to it by Debtor/Defendant. In its complaint, the Bank alleges fraud by Debtor in its relationship with the Bank. The Bank asserts that by reason of the "false and fraudulent statements of Debtor", Debtor's obligation to the Bank should be determined to be nondischargeable. The complaint does not specify upon which exception to discharge it relies under § 523 in asserting that this obligation is nondischargeable. After completion of discovery, the parties were directed to submit a joint pretrial statement. Each party filed a separate pretrial statement. Under legal contentions, the Bank asserts:
As a result of representations made by Defendant McCleary in writing, which were materially false regarding his financial condition, Plaintiff extended credit or renewed credit. The Plaintiff, as the creditor here, relied upon the representations of the Defendant *881 McCleary with respect to the status of his financial condition.
This language closely tracks that of 11 U.S.C. § 523(a)(2)(B). Therefore, at the beginning of trial, it appeared that the Bank was relying upon § 523(a)(2)(B). Debtor's answer does not refer to a specific code section nor does his pretrial statement set out any reference to a specific code section. Debtor denies all of the Bank's legal contentions and states: "Further, the Defendant at no time intended to mislead Plaintiff and there was no fraud or misrepresentations made by the Defendant to the Plaintiff." Thus, the Bank appeared to be relying upon § 523(a)(2)(B). It was unclear what code section Debtor believed applied to this case.
After trial, the parties were allowed to submit post-trial briefs. The Bank's brief, filed July 19, 2002, does not analyze this case under § 523(a)(2)(B) as defined in the pretrial statement. Instead, it analyzes the case under the five elements of fraud ordinarily associated with § 523(a)(2)(A). Debtor filed his post-trial brief on July 26, 2002. Debtor's brief is largely a denial of any wrongdoing but, to the extent it focuses on § 523, it also applies § 523(a)(2)(A). Because of this inconsistency in pleading a theory of the case, the Court is not certain which section the parties intend to apply. Because of this, the Court will examine both sections to determine which section to apply.

FINDINGS OF FACT
Debtor Joe Layne McCleary has educational training as a municipal engineer with experience in construction. He has been involved in the construction business for over ten years. He started Quality "1" Construction, Inc. (Quality "1") in February of 1998.
Debtor had a prior relationship with Mercantile Bank ("Mercantile") where he dealt primarily with loan officer Loras Goedken. After Mercantile was purchased by Firstar Bank, it modified its loan policy and no longer made commercial loans in amounts less than $500,000. Smaller loans were needed by Quality "1". As a result, Goedken advised Debtor to try to obtain other financing. Sometime prior to November 15, 1999, Debtor contacted Kevin Slater, a loan officer with Plaintiff Fairfax State Savings Bank, in hopes of securing business loans for Quality "1".
Slater testified for the Bank. He graduated from the School of Banking in Iowa City and later attended the Graduate School of Banking in Madison. He is currently enrolled in the MBA program at the University of Iowa and has been employed in the banking industry for the last 10-15 years. Debtor testified that the primary reasons Slater made loans to Quality "1" were Debtor's expertise, the number of job contracts held by Quality "1", and the fact that Quality "1" had numerous opportunities to do construction work for municipalities. Debtor advised Slater of several jobs that Quality "1" had bid.
Slater contacted Goedken at Mercantile to confirm that Mercantile had issued loans to Quality "1" in the past. Goedken informed Slater that Quality "1" had a loan outstanding with Mercantile in the amount of $182,000, with a due date of June 2000. Goedken apparently informed Slater that even though Quality "1" had occasionally been late with payments, its loans were not considered high risk.
In addition to relying on the comments made by Goedken, Slater relied on certain financial documents in making the decision to loan money to Quality "1". These documents are:
(1) a 1998 Tax Return,
(2) Profit and Loss Statement (As of August 1999),

*882 (3) Depreciation Schedule (Through year ending 1998),
(4) Equipment List (November 1999),
(5) Asset Listing Report (As of November 1998), and
(6) Cash Flow Statement (1999).
The parties dispute whether Debtor provided these documents to Slater before the loans were made. Debtor testified that his accountant or business manager at the time may have provided these documents to Slater. In any event, they came into possession by the Bank and were produced by the Bank as exhibits at trial. These exhibits do not provide substantial information upon which to determine the fair market value of Debtor's equipment. The Equipment List shows only the cost. The Depreciation Schedule and Asset Listing Report list the cost of each piece of equipment with its accumulated depreciation. These also show that some of the equipment had been put into service as early as February 1998.
In addition to comments made by Goedken and the documents described above, Slater apparently relied on oral comments made by Debtor. Slater testified that Debtor orally asserted that he was the owner of a majority of the equipment listed in the various documents.
Debtor signed two promissory notes on behalf of Quality "1" on November 15, 1999, totaling $257,000.00. He also signed a security agreement for Quality "1" which provided the Bank a security interest in all of its equipment, accounts and most of the titled vehicles. Debtor individually signed a continuing, unlimited guaranty on November 15, 1999, guaranteeing personal responsibility for these loans from the Bank to Quality "1". The Bank filed a UCC statement covering the equipment on December 6, 1999. Quality "1" forwarded a cashier's check for $182,000.00 to Mercantile Bank to pay off its loan and eliminate Mercantile's security interest.
At no time did Slater obtain a traditional financial statement from Debtor. He testified that he did not do so because Mercantile had assured him there was adequate collateral. He also testified that at no time prior to the November 1999 loans did he conduct a UCC check. Slater testified that he did not obtain all of the titles to the vehicles nor did he receive a notice of termination of the financing statements from Mercantile. As of the time of trial, it was not clear whether Mercantile retained security interests in any of this property.
In late 1999 and early 2000, Quality "1" began to experience severe business reversals. Several contracts did not generate a profit. Additionally, a project in Williamsburg, Iowa ran into cash flow problems. As a result, Debtor did not make any payments to the Bank. Still, in February 2000, the Bank allowed Debtor to sign two additional promissory notes totaling $35,000.00.
The grievances lodged by the Bank are of several varieties. The Bank contends Debtor did not own all of the property listed on the documents obtained by the Bank. It alleges the values provided on the financial documents was exaggerated. It asserts that trade debt existed which was not made known to the Bank. The Bank asserts that Debtor sold encumbered property without notifying the Bank and without applying the proceeds to the Bank's loans. Finally, it asserts that Debtor did not notify the Bank of a lawsuit involving a concrete supplier.
While certain of the allegations are contested, it is undisputed that Debtor failed to disclose that Quality "1" was behind in payments to a supplier and that it was in danger of being sued. Debtor was in arrears to supplier Hawkeye Ready Mix in the amount of $5,937.43 in late 1999. Slater *883 did not learn of this supplier's potential action against Quality "1" until after the loans were finalized.
Eventually, the Bank obtained an order of replevin on August 11, 2000, in Iowa District Court. This forced termination of the business operations of Quality "1". The notes owed to the Bank by Quality "1" totaled $292,000. The value of the equipment the Bank obtained on replevin amounted to $10,000.

CONCLUSIONS OF LAW
While it is unclear which section of 523(a)(2) is intended by the parties to apply in this case, it is clear that the Bank seeks to have Debtor's loan obligations found nondischargeable under one or both alternatives of § 523(a)(2). Exceptions to discharge must be "narrowly construed against the creditor and liberally against the debtor, thus effectuating the fresh start policy of the Code. These considerations, however, are applicable only to honest debtors." In re Van Horne, 823 F.2d 1285, 1287 (8th Cir.1987). The pertinent part of 11 U.S.C. § 523(a) provides:
A discharge under . . . this title does not discharge an individual debtor from any debt 
. . .
(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by 
(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; [or]
(B) use of a statement in writing 
(i) that is materially false;
(ii) respecting the debtor's or an insider's financial condition;
(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
(iv) that the debtor caused to be made or published with intent to deceive;

Section 523(a)(2)(A) or Section 523(a)(2)(B)
The Court must first determine which code section is applicable. It is well established that § 523(a)(2)(A) is intended to apply in cases of false pretenses or actual fraud. The drafters of the 1978 amendments to the Code intended that false financial statements would be addressed separately. This separate treatment was codified in § 523(a)(2)(B). To avoid any doubt that false financial statements were to be treated separately, Congress added language to § 523(a)(2)(A) which provides that this code section applies to all types of fraud "other than a statement respecting the debtor's . . . financial condition". False representations involving statements respecting a debtor's financial condition are to be dealt with exclusively under § 523(a)(2)(B). The elements are, in substantial respects, different from those under § 523(a)(2)(A).
Case law has consistently and unanimously held that paragraphs (A) and (B) of § 523(a)(2) are mutually exclusive. The Court must, therefore, examine what is actually alleged and proven in this case to determine which of these subsections apply in the present context. It is clear from any fair reading of the Bank's complaint, the Bank's evidence, and the Bank's briefs, that a business relationship existed between the Bank and Debtor. The Bank alleges that Debtor provided false financial information respecting his financial condition upon which the Bank relied to its detriment in granting Debtor credit. This case is completely centered around Debtor's financial condition.
*884 The only aspect of § 523(a)(2)(A) which requires examination is whether the allegations involved in this case constitute the type of "statements" which are excluded from treatment under § 523(a)(2)(A). Some courts have held that such statements are limited to balance sheets showing the debtor's net worth. See, e.g., In re Olinger, 160 B.R. 1004, 1009 (Bankr.S.D.Ind.1993); In re Mercado, 144 B.R. 879, 885 (Bankr.C.D.Cal.1992). Other courts have construed the phrase more broadly. In re Van Steinburg, 744 F.2d 1060, 1060-61 (4th Cir.1984) (holding an equipment list which the debtor submitted to secure a loan to be a statement in writing respecting his financial condition sufficient to satisfy § 523(a)(2)(B)). The court in Van Steinburg held that
Congress did not speak in terms of financial statements. Instead it referred to a much broader class of statements  those respecting a debtor's . . . financial condition. A debtor's assertion that he owns certain property free and clear of other liens is a statement respecting his financial condition. Indeed, whether his assets are encumbered may be the most significant information about his financial condition.
Id. at 1061.
This latter interpretation has been followed by courts in the Eighth Circuit. See, e.g., In re Kerbaugh, 162 B.R. 255, 261 (Bankr.D.N.D.1993) (stating "the writing required by § 523(a)(2)(B) is sufficiently broad enough to include any statement made by the Debtor, not just formal financial statements and documents in a bank or commercial setting"); see also, Kloven v. Ramsey, 1993 WL 181309, *2 (D.Minn. Apr. 22, 1993) (stating that a statement respecting the debtor's financial condition is one concerning the debtor's overall financial health, net worth, or ability to generate income); In re Long, 774 F.2d 875, 877 (8th Cir.1985) (stating that Debtor's misrepresentations as to the value of its inventory are "statements in writing respecting the debtor's or an insider's financial condition").
The record indicates Slater considered six documents when determining whether to extend credit. These are:
(1) a 1998 Tax Return,
(2) Profit and Loss Statement (As of August 1999),
(3) Depreciation Schedule (Through year ending 1998),
(4) Equipment List (November 1999),
(5) Asset Listing Report (As of November 1998), and
(6) Cash Flow Statement (1999).
Documents 1, 2 and 6 each demonstrated Debtor's ability to generate income. Documents 3, 4 and 5 provided Slater with some insight regarding Debtor's assets, their value and encumbrances. These documents qualify as statements "respecting the debtor's financial condition."
Slater testified regarding oral statements by Debtor regarding his financial condition. Debtor told Slater about bids on numerous jobs that were at the time outstanding. Slater testified Debtor told him that he owned a majority of his business equipment. The Bank received information, orally, from Goedken at Mercantile Bank concerning its banking relationship with Debtor. Clearly, these are statements "respecting the debtor's financial condition" under § 523(a)(2)(B). However, for reasons discussed later, they do not constitute a basis for an exception from discharge under § 523(a)(2)(B).
It is the ultimate conclusion of this Court, for the reasons set out in this opinion, that § 523(a)(2)(A) does not apply because all statements the Bank received involved Debtor's financial condition. For *885 the reasons set out in the statement of the case, the Court will examine the elements of § 523(a)(2)(B) with regard to the six written documents on which the Bank relied when extending credit to Debtor.

11 U.S.C. § 523(a)(2)(B)
The elements of § 523(a)(2)(B) require that: (1) the false financial statement is a writing respecting the debtor's financial condition; (2) the financial statement is materially false; (3) the debtor intended to deceive; and (4) the creditor reasonably relied on the statement. In re Foley, 156 B.R. 645, 648 (Bankr.D.N.D.1993). The Bank must prove each of these elements by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 286-87, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). The Court will apply these elements to the initial loans made in November of 1999 totaling $257,000, as well as the subsequent $35,500 loans made in February of 2000.

THE INITIAL LOANS

(1) Statement as a Writing Respecting Debtor's Financial Condition.
The first element under § 523(a)(2)(B) requires application of a two-prong test. The first prong evaluates the existence of a written document. The second prong focuses on the content of that document. Kerbaugh, 162 B.R. at 262. An objecting creditor who relies on a debtor's oral misrepresentations of his or her financial wherewithal will not be entitled to a nondischargeability determination under § 523(a)(2)(B). Id. at 261.
Slater testified concerning financial data received by him from Debtor in both oral and written form. Only written statements respecting Debtor's financial condition are considered under § 523(a)(2)(B). Thus, oral assertions allegedly made by Debtor will not be considered in determining dischargeability under § 523(a)(2)(B).
Written statements need not be physically prepared by a debtor to satisfy the writing requirement of § 523(a)(2)(B). Id. at 262. The writing requirement is satisfied if the written statement was signed, adopted and used, or caused to be prepared by, the debtor. Id.
The six documents relevant here were provided to Slater sometime before the November 1999 loans were made. Debtor testified that although he did not personally furnish these documents to Slater, it was likely that his accountant or business manager had done so. Given the nature of these documents, they were either used by Debtor or prepared for operational purposes. This Court concludes that this is sufficient to satisfy the first element of § 523(a)(2)(B).

(2) Materially False Statement.
The concept of "materiality" within the context of § 523(a)(2)(B) includes objective and subjective components. In re Dammen, 167 B.R. 545, 551 (Bankr.D.N.D.1994). Objectively, a statement is materially false if it "paints a substantially untruthful picture of a financial condition by a misrepresentation of the type which would normally affect the decision to grant credit." In re Dygert, 2000 WL 630833, *8 (Bankr.D.Minn. May 11, 2000). It is well established that writings with pertinent omissions can readily constitute a statement that is materially false for purposes of § 523(a)(2)(B). Dammen, 167 B.R. at 551; In re Bundy, 95 B.R. 1004, 1008 (Bankr.W.D.Mo.1989). The relevant subjective inquiry, although not dispositive, is whether the complaining creditor would have extended credit had it been apprized of the debtor's true situation. Kerbaugh, 162 B.R. at 262.
*886 The Bank asserts that the financial documents provided by Debtor to Slater were materially false in that they omitted outstanding obligations and did not accurately reflect the ownership and value of business equipment. First, the Bank claims that Debtor did not disclose his outstanding accounts with several suppliers. Specifically, Slater testified that Debtor failed to disclose that he owed $6,000 to Hawkeye Ready Mix, Inc. Correspondence from Hawkeye Ready Mix, Inc. informed Debtor that he was not only behind, but "significantly past due." Debtor testified that it was not unusual for contractors to be behind to their suppliers.
It is true that silence under certain circumstances can constitute an untruthful statement. However, after carefully evaluating this record, it is the conclusion of this Court that Debtor's silence on this issue does not, in and of itself, constitute a substantially untruthful assertion of Debtor's financial condition. A $6,000 balance on an outstanding account is not large when compared to Debtor's net expenditures. The Profit and Loss Statement shows that Debtor had incurred roughly $448,000 in expenses as of August 1999. Given the size of the loan, Debtor's net expenditures, and Slater's eagerness to help Debtor build his business, this Court cannot conclude that Slater's decision to approve the loan would be affected by knowledge of this outstanding account.
Second, Slater testified that Debtor's financial documents provided to the Bank failed to disclose a "good majority" of the lease obligations on the equipment. Both the Depreciation Schedule and Asset Listing Report delineate the accumulated depreciation for each piece of equipment. Although Debtor did not provide Slater with the details of his ownership or leasehold interests in equipment, the absence of this information alone does not provide a substantially untruthful depiction of Debtor's financial condition. The complained of inaccuracies were readily apparent from the face of the documents. The Profit and Loss Statement shows expenses for equipment rental. Such provisions indicate that Debtor employed alternative methods of financing for different pieces of equipment. It is the opinion of this Court that a cursory review of this document should have put Slater on notice as to potential outstanding lease obligations. Based on the foregoing, this Court concludes that these omissions do not make the financial documents materially false.

(3) Creditor's Reasonable Reliance.
For a debt to be excepted from discharge under § 523(a)(2)(B), the creditor's reliance on false written statements must satisfy a two-part inquiry by demonstrating that its reliance was both actual and reasonable. Dammen, 167 B.R. at 552. The record indicates that Slater actually relied, at least in part, on the financial documents in making the November 1999 loans to the Debtor.
The issue in this case is whether that reliance was reasonable. A determination of reasonableness is based upon the totality of the circumstances. First Nat'l Bank v. Pontow, 111 F.3d 604, 610 (8th Cir.1997). Among other things, a court may consider whether there were any "red flags" that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and whether even minimal investigation would have revealed the inaccuracy of the debtor's representations. Id.
Slater testified the general procedure of Fairfax State Savings Bank is to have the prospective debtor fill out a financial statement listing assets and liabilities. The Bank reviews those financial *887 statements to ascertain the net worth of the individual. It next secures the necessary collateral. The Bank generally asks the debtor's spouse be a signatory on the loan. It also conducts a credit check.
The record reveals that Slater did not follow the Bank's normal procedures in granting Debtor loans. He did not require Debtor to fill out a financial statement or require Debtor's spouse to be a signatory. Slater relied upon the six written documents. Under § 523(a)(2)(B), the Court disregards oral statements upon which Slater says he relied, such as the conversations with Mercantile Bank and Debtor. This Court finds that Slater's reliance on Debtor's six financial documents was not reasonable.
The Profit and Loss Statement and 1998 Tax Return depicted Debtor's ability to generate income. Unlike a formal financial statement or balance sheet, which details an entity's assets and liabilities, these documents merely provide a history of Debtor's profitability. They give no indication as to whether Debtor had any significant outstanding liabilities. The absence of a financial statement listing Debtor's liabilities made it impossible for Slater to accurately assess Debtor's net worth. Case law supports the notion that "a facially incomplete financial statement, which does not contain sufficient information to present the true financial condition of the debtor, would not by itself support a claim of reasonable reliance." In re Lippert, 84 B.R. 612, 617 (Bankr.D.Minn.1988).
It was the Bank's general procedure to loan up to 80% of the value of collateral. Slater relied on the Depreciation Schedule, Asset Listing Report, and Equipment List documents when determining the value of the equipment. Each of these documents valued the equipment at "cost." Slater agreed that "cost" meant the price Debtor paid for it, rather than the fair market value. In addition, the Depreciation Schedule and the Asset Listing Report show that some of Debtor's equipment had been put into service as early as February 1998. Although both documents list the accumulated depreciation for the equipment, it is unreasonable to assume that the actual value of the equipment had subsequently declined at a similar rate. Given the magnitude of the loan, it was not reasonable to grant approval without first verifying the existence of the equipment and procuring an appraisal to determine fair market value.
Both the Depreciation Schedule (For Year Ending 1998) and the Asset Listing Report (As of November 1998) were nearly a year old. Reliance on stale financial documents is not reasonable under Eighth Circuit case law. See, Jones, 31 F.3d at 661 (stating that where a creditor relied on an eight month old financial statement and never inquired as to whether the statement actually reflected the debtor's current financial situation, the creditor failed to show reasonable reliance). As a whole, these documents do not amount to the type of financial statements that any creditor could reasonably rely upon without some further inquiry and verification. No reasonable lender would be able to discern Debtor's financial wherewithal based solely on the financial documents presented.
No traditional financial statement was ever obtained from Debtor. Slater testified that he did not do so because he relied upon statements from Goedken at Mercantile Bank that Debtor had adequate collateral. In relying upon the representation of Mercantile, Slater made certain assumptions about the remainder of the financial data provided which may or may not have been consistent with Debtor's true financial picture.
*888 The Bank does not really assert that the financial documents provided were inaccurate, in and of themselves. It appears that each document is a more or less accurate reflection of what it is purported to represent. However, the Bank asserts that, when taken in its entirety, the information provided is incomplete and misleading. There is no doubt that the financial information provided has gaps and is incomplete. It is also true that certain allegations of misconduct by Debtor have substantial credibility. Nevertheless, this conduct by Debtor occurred well after any representations were made concerning his financial condition which is the true focus of this litigation.
When viewed in its entirety, the record is most accurately interpreted, in this Court's opinion, by concluding that the Bank relied to a substantial extent on representations made by Debtor's previous lender. Having been reassured by Debtor's prior lender, the Bank deviated from its normal practice of seeking complete financial documentation and drew conclusions which may not have been warranted if the documents had been viewed with a more critical eye. Nevertheless, when the entire record is evaluated, there is little evidence to support the conclusion that Debtor generated the confused financial information. The Bank, in this case, abandoned its normal financial disclosure procedures, it relied upon financial information provided by a third party, and it showed a lack of critical curiosity about the documents that were produced. Many, if not all, of the grievances made by the Bank at this time could have been easily remedied by obtaining a full financial statement in the beginning. Under all of these circumstances, this Court must conclude that any reliance upon the information provided by Debtor was not reasonable. Based on all of these facts, this Court must conclude that the Bank has failed to establish reasonable reliance as defined in § 523(a)(2)(B).
(4) Intent to Deceive.
Discharge is barred under § 523(a)(2)(B) only if, among other things, the debtor acted with the intent to deceive. Jones, 31 F.3d at 661. Courts have held that a creditor can establish intent to deceive by proving reckless indifference to or reckless disregard of the accuracy of the information in a debtor's financial statement. In re Johnson, Adv. 95-6074KW, slip op. at 6 (Bankr.N.D.Iowa Feb. 12, 1996). This Court has stated that "intent can be gleaned from surrounding circumstances." In re Capps, Adv. 93-2106KD, slip op. at 3 (Bankr.N.D.Iowa Nov. 24, 1993); In re Walderbach, No. L92-00780C, Adv. No. 92-1135LC, slip op. at 8 (Bankr.N.D.Iowa Aug. 31, 1993). Some factors persuasive on the issue of intent to deceive include "whether the debtor was intelligent and experienced in financial matters, and whether there was a clear pattern of purposeful conduct." Capps, slip at 5; Walderbach, slip at 8-9; see also In re Joyner, 132 B.R. 436, 442 (D.Kan.1991) (considering the omission of significant liabilities as strong evidence of intent to deceive).
As to the information the Bank received regarding Debtor's finances, the record does not support a finding of recklessness or actual intent to deceive. While Debtor did not offer to present a current and complete financial statement, neither did the Bank request one. The Bank was content with the limited information it received about Debtor's financial picture. Debtor's failure to provide more relevant and accurate information cannot be interpreted as an intent to deceive in these circumstances. Based on the entire record, the Court concludes the Bank has *889 failed to prove Debtor had the requisite intent to deceive under § 523(a)(2)(B)(iv).

THE SUBSEQUENT LOANS
Debtor testified that he ran into problems with the Williamsburg project in the spring of 2000. The Bank loaned an additional $35,500 to Debtor on February 15, 2000 for operating costs. Again, Slater did not require Debtor to submit a financial statement. He continued to rely on the previous incomplete and out-of-date financial documents along with a Cash Flow Statement for 1999. Under all the circumstances of this case, such reliance is unreasonable under § 523(a)(2)(B). This Court must conclude that the debt arising from the loans made February 15, 2000 is also dischargeable.

CONCLUSION
This Court concludes that § 523(a)(2)(A) does not apply to this case since the allegations relate solely to financial documents. The conduct alleged lies solely within the purview of § 523(a)(2)(B). In examining this record in its entirety, it is the conclusion of this Court that the Bank has not established by a preponderance of evidence each and every element required to be proven under 11 U.S.C. § 523(a)(2)(B) when applied to both the November 15, 1999 and February 15, 2000 loans. Accordingly, the Bank's complaint requesting that Debtor's loans be excepted from discharge under § 523(a)(2)(B) must be denied.
WHEREFORE, 11 U.S.C. § 523(a)(2)(A) is not applicable in these circumstances.
FURTHER, the Bank has failed to prove all the elements of § 523(a)(2)(B).
FURTHER, for all the reasons set forth herein, Plaintiff Fairfax State Savings Bank's complaint to determine dischargeability of debt under 11 U.S.C. § 523(a) is DENIED.
FURTHER, Debtor's obligations to Fairfax State Savings Bank are DISCHARGED.