In the Matter of Raymond Eugene
LAWSON and Pamela Ann
Lawson, Debtors.

NAFCO Federal Credit
Union, Plaintiff,

v.

Raymond Eugene Lawson and Pamela
Ann Lawson, Defendants.

Bankruptcy No. BK03–40376.
Adversary No. A03–4043.

United States Bankruptcy Court.
D. Nebraska.

Feb. 10, 2004.

Bert E. Blackwell, McCook, NE, for Debtor/Defendant.

Arend Baack, Leininger, Smith, Johnson, Baack, Grand Island, NE, for Plaintiff.

## MEMORANDUM

TIMOTHY J. MAHONEY, Chief Judge.

Trial was held December 15, 2003, in Lincoln, Nebraska, before a United States Bankruptcy Judge for the District of Nebraska regarding Filing # 1, Complaint for Determination of Dischargeability and Objection to Discharge. Arend Baack appeared for plaintiff, and Bert Blackwell appeared for defendants. This memorandum contains findings of fact and conclusions of law required by Federal Rule of Bankruptcy Procedure 7052 and Federal Rule of Civil Procedure 52. This is a core proceeding as defined by 28 U.S.C. § 157(b)(2)(*l*) and (J).

Raymond Lawson graduated from college with an accounting degree. After college, he was employed with the National Credit Union Association ("NCUA") and examined the books of credit unions. He became familiar with rules and regulations concerning credit unions. During his employment, he examined the books of plaintiff NAFCO and then in 1991, he left NCUA and worked for a company, Nash–Finch, which was a supplier of grocery products to retail stores. NAFCO was a credit union organized for the benefit of employees of Nash–Finch.

Shortly after he became employed at Nash–Finch, he was asked to become a member of the board of NAFCO. He remained on the board from 1991 to early 2002, and served as president for several years. He worked for Nash–Finch for approximately eight years, until it closed in 1998. He then became employed by an accounting firm.

During his term as a member of the board of directors and as president of NAFCO, he participated in drafting policies for the operation of the credit union. As president, he conducted the monthly board meetings and worked on the budget. He worked closely with the manager of the credit union.

During the time he was on the board and while he was president, he borrowed for personal needs and for business needs from NAFCO. One of the policies with regard to the granting of business loans required borrowers to provide periodic financial statements. In addition, loans to board members in excess of $20,000 required board approval.

Mr. Lawson did not provide NAFCO with a personal financial statement concerning any of his loans until August 2002, after the time that he had left the presidency and the board. During the time that he was on the board and as president, many, if not most, of the loans made to him were made without prior board approval, and, as mentioned above, without financial statements being provided.

NAFCO is regularly audited, and one of the audits criticized a loan to Mr. Lawson that had been made without board approval.

During at least three years while he was on the board and serving as president, he received loans which exceeded $20,000. The loans to him were eventually approved by the board, but not until after he had received the loan proceeds.

Because of financial difficulties apparently related to his wife's hair salon business, he was unable to timely pay all of his loans, and some or all of them went into default in 2002. In addition, he had overdrafts on his share account during early 2002, while he was still president of the board.

In 2002, Mr. Lawson purchased a new Volkswagen for approximately $25,000. He wrote a check to the dealership for the full amount of the cost of the vehicle, but he did not have sufficient funds on hand to cover the cost. The check arrived at the

credit union before he had completed a loan application and before the board of directors had authorized the loan. As a result of his conversations with the loan officer and manager of the credit union, the check was honored and a short-term loan was made. He was requested at the time the loan was made to provide a personal financial statement, but he did not do so until several months later, and then only after the term of the loan had expired and he had requested a renewal or rewrite of the loan as an installment loan.

The financial statement that was eventually provided, after he was no longer a member of the board or president, indicated that he and his spouse had a net worth of $62,911. His assets included jewelry valued at $4,750, personal property other than vehicles with a value $27,480, and business equipment and inventory at a value of $61,240. The financial statements were dated June 30, 2002.

The debtors filed this Chapter 7 case on February 3, 2003. Their schedules, on the date of filing, showed a negative net worth of $133,680.68. Jewelry listed on the schedule was valued at $360, and business equipment and inventory was valued at $23,487.83.

The credit union has filed this adversary proceeding requesting a determination that the debt owed to the credit union is not dischargeable under 11 U.S.C. § 523(a)(2)(B) and 11 U.S.C. § 523(a)(4). In addition, the credit union asserts that the debtors should be denied a discharge under 11 U.S.C. § 727(a)(2) and/or 11 U.S.C. § 727(a)(5).

## I. § 523(a)(2)(B)

■ In support of the plaintiff's position that the debt remaining after liquidation of certain assets, $44,652.66, should not be discharged, the credit union points to the discrepancies between the financial statement provided in the late summer of 2002 and the bankruptcy schedules filed in early February 2003. Mr. Lawson explained the differences in the numbers by claiming that the financial statement was based on his good-faith estimate of the cost or current market value of the assets in the summer of 2002. The schedules, on the other hand, were based upon his and his attorney's estimate of trustee liquidation value. In addition, on the petition date, some of the assets that had been listed on the financial statement had been turned over to the bank for liquidation and some had actually been sold by the bank with the proceeds applied to the outstanding debt.

Because Mr. Lawson is an accountant with many years of experience in preparation of financial statements, his explanation of the difference in values of assets over a six-month period is viewed with some skepticism. However, the explanation is somewhat plausible and there is no contrary evidence.

■ To except a debt from discharge under 11 U.S.C. § 523(a)(2)(B), a creditor must prove, by a preponderance of the evidence, that (1) the debtor made (2) a statement in writing (3) respecting the debtor's financial condition (4) which was materially false and (5) made with the intent to deceive, and (6) which was reasonably relied upon by the creditor. *Heritage Bank of St. Joseph v. Bohr (In re Bohr)*, 271 B.R. 162, 167 (Bankr.W.D.Mo. 2001).

### A. "Materially false"

■ A financial statement is materially false if it "paints a substantially untruthful picture of a financial condition by a misrepresentation of the type which would normally affect the decision to grant credit." *Id.* Likewise, a financial statement is materially false if it falsely represents the

debtors' overall financial condition or has major omissions. *Id.* In the *Bohr* case, a financial statement listing real property as an asset was materially false in light of the fact that debtors held only a remainder interest in the property, subject to a life estate, so the interest had no value. Without the real estate, the debtors' net worth dropped from $270,000 to $8,000, so the misrepresentation was material.

■ The relevant subjective inquiry, although not dispositive, is whether the complaining creditor would have extended credit had it been apprised of the debtor's true situation. *Fairfax State Sav. Bank v. McCleary (In re McCleary)*, 284 B.R. 876, 885 (Bankr.N.D.Iowa 2002). In *McCleary*, the lender argued that the debtor's financial documents were materially false because they omitted certain outstanding obligations and did not accurately reflect the ownership and value of certain business equipment. The court disagreed, noting that the unlisted debt, a $6,000 balance due on a revolving account with a supplier, was not significant in comparison to the debtor's net expenditures of $448,000 for the first seven or eight months of the year. Moreover, the debtor's failure to provide the bank with details of his obligations for leased equipment was not "substantially untruthful" as the information sought was readily apparent from the face of the documents. The court opined that "a cursory review of [the profit and loss statement] should have put [the lender] on notice as to potential outstanding lease obligations." *McCleary*, 284 B.R. at 886.

### B. "Intent to deceive"

■ For discharge to be barred, the debtor must have acted with intent to deceive. An intent to deceive does not mean that the debtors acted with a "malignant heart." *Bohr*, 271 B.R. 162, 169 (quoting *Agribank v. Webb (In re Webb)*, 256 B.R.

292, 297 (Bankr.E.D.Ark.2000)). A creditor may establish such intent by proving reckless indifference to or reckless disregard of the accuracy of the information in a debtor's financial statement. *McCleary*, 284 B.R. at 888. Factors to consider include whether the debtor was intelligent and experienced in financial matters, and whether there was a clear pattern of purposeful conduct. *Id.* (citations omitted). Once the creditor establishes that the debtor had actual knowledge of the false statement, the debtor cannot overcome the inference of the intent to deceive with unsupported assertions of honest intent. *Bohr*, 271 B.R. at 169. The court in *Bohr* found intent to deceive based on the debtors' admission that they knew the land did not belong to them and that the financial statements containing information to the contrary were submitted for the purpose of obtaining credit. The inference from those facts was that the debtors intended to deceive the lender. *Id.*

By contrast, the court in *McCleary* found no intent to deceive because the bank was so lax in obtaining full disclosure of the debtor's financial situation. "The Bank was content with the limited information it received about Debtor's financial picture. Debtor's failure to provide more relevant and accurate information cannot be interpreted as an intent to deceive in these circumstances." 284 B.R. at 888.

### C. "Reasonable reliance"

■ The reasonableness of a creditor's reliance is to be determined in light of the totality of the circumstances, *Guess v. Keim (In re Keim)*, 236 B.R. 400, 402–03 (8th Cir. BAP 1999) (citing *First Nat'l Bank of Olathe v. Pontow*, 111 F.3d 604, 610 (8th Cir.1997)). Among the factors to consider is "whether there were any 'red flags' that would have alerted an ordinarily prudent lender to the possibility that the

representations relied upon were not accurate; and whether even minimal investigation would have revealed the inaccuracy of the debtor's representations." *Sinclair Oil Corp. v. Jones,* 31 F.3d 659, 662 (8th Cir.1994) (quoting *Coston v. Bank of Malvern (In re Coston),* 991 F.2d 257, 261 (5th Cir.1993) (en banc)).

In *Keim,* the court ruled that the creditor could not have reasonably relied on handwritten and incomplete financial statements. The creditor extended credit primarily because the debtors listed a one-sixth ownership interest in a building. The creditor did not verify the ownership interest, or the value of the interest or of the building. The B.A.P. agreed with the bankruptcy court that no reasonable person would have been able to discern the debtors' financial condition solely from the financial statement provided, and reproved the creditor for not asking for proof of the debtors' ownership interest, not conducting a title search, not procuring an appraisal, and not even verifying the existence of the building. *Keim,* 236 B.R. at 403 n. 2.

In *Bohr, supra,* the court found that the lender reasonably relied on the debtors' purported ownership of real estate listed in their financial statements, although the debtors actually held only a remainder interest. A creditor is not required to assume that a debtor is lying or misrepresenting facts in a financial statement. *Bohr,* 271 B.R. at 168. "While a minimal investigation would most likely have revealed the true ownership of the real estate and thereby exposed the falsity of the financial statements, there were no 'red flags' for the Bank that would have triggered such an investigation" until the debtor informed the bank more than a year after the last financial statement that they did not actually own the property outright. *Id.* at 168–69. At that point, the bank immediately investigated the debtors' assets and learned the truth.

In *McCleary, supra,* the court concluded that the lender failed to protect its own interests.

The Bank, in this case, abandoned its normal financial disclosure procedures, it relied upon financial information provided by a third party [the debtor's prior lender], and it showed a lack of critical curiosity about the documents that were produced. Many, if not all, of the grievances made by the Bank at this time could have been easily remedied by obtaining a full financial statement in the beginning. Under all of these circumstances, this Court must conclude that any reliance upon the information provided by Debtor was not reasonable.

284 B.R. at 888.

The only loan for which the false financial statement exception to discharge could be applicable is the renewal of credit granted in September 2002 for the Volkswagen. Since the credit union had no prior financial statements, it could not have relied upon any financial statements for any other loan. The Volkswagen has been sold, and the balance on the note is $9,657.79.

I find no evidence that the financial statement was false in any respect. The debt shall not be excepted from discharge under the "false financial statement" claim for relief.

## II. *§ 523(a)(4)*

NAFCO also believes that a debt incurred by Mr. Lawson should not be discharged because, it is alleged, he breached his fiduciary duty to the credit union while he was a member of the board of directors and the president by taking out loans from the credit union without following the policies authorized by the board of directors. For example, none of

his loans were approved by the board of directors prior to the loans being funded. In addition, the business loans that he took out were never supported by a personal financial statement. Finally, when his business loans exceeded $20,000, he did not obtain prior board approval. In each situation referred to above, he, as a member of the board and president, violated board policy.

 The Bankruptcy Code explicitly extends the scope of "acting in a fiduciary capacity" for purposes of § 523(a)(4) to "[a]ny institution-affiliated party of a[sic] insured depository institution." 11 U.S.C. § 523(e). An "institution-affiliated party" includes "any committee member, director, officer, or employee of, or agent for, an insured credit union." 11 U.S.C. § 101(33)(B); 12 U.S.C. § 1786(r)(1). *Office of Thrift Supervision v. Felt (In re Felt)*, 255 F.3d 220 (5th Cir.2001), *cert. denied*, 534 U.S. 1078, 122 S.Ct. 807, 151 L.Ed.2d 693 (2002); *In re Gaubert*, 149 B.R. 819 (Bankr.E.D.Tex.1992). Even without considering § 523(e), it is clear that officers and directors of financial institutions owe a fiduciary duty to the institution. *Kansas Bankers Surety Co. v. Eggleston (In re Eggleston)*, 243 B.R. 365, 376–77 (Bankr.W.D.Mo.2000); *Federal Deposit Ins. Corp. v. Wright (In re Wright)*, 87 B.R. 1011, 1017–18 (Bankr.D.S.D.1988). As a corporate officer and director, the debtor owes a fiduciary duty to the corporation:

> The rule is thoroughly embedded in the general jurisprudence of ... America ... that the status of directors is such that they occupy a fiduciary relation toward the corporation and its stockholders, and are treated by courts of equity as trustees. Courts hold the directors of a corporation to the strictest accountability. Conduct inconsistent with any duty is condemned. The fiduciary rela-

tion is so vital that directors are not only prohibited from making profit out of corporate contracts, and from dealing with the corporation except upon the most open and on the fairest terms, but the rule of accountability is so strict that they are not permitted to anticipate the corporation in the acquisition of property reasonably necessary for carrying out the corporate purposes or conducting the corporate business.

*Anderson v. Bellino*, 265 Neb. 577, 588–89, 658 N.W.2d 645, 656 (2003) (quoting *Nebraska Power Co. v. Koenig*, 93 Neb. 68, 75, 139 N.W. 839, 841–42 (1913)).

I conclude that Mr. Lawson did have a fiduciary duty to the credit union at the time he incurred all of the debts, except for the final September 2002 installment loan for the Volkswagen. He was no longer a member of the board or president at that time. I further conclude that he violated his fiduciary duty to the credit union by incurring such debt in violation of board policies. Therefore, I find that all of the obligations incurred by Mr. Lawson, except for his debt for the Volkswagen represented by the September 2002 note, are excepted from discharge under 11 U.S.C. § 523(a)(4).

### III. § 727(a)(2)

The credit union also suggests that the debtors, and both of them, should be denied a discharge for concealing or conveying property with the intent to hinder or defraud the credit union. Such a claim arises under 11 U.S.C. § 727(a)(2).

 Denial of discharge is "a serious matter not to be taken lightly by a court." *McDonough v. Erdman (In re Erdman)*, 96 B.R. 978, 984 (Bankr.D.N.D. 1988). The provisions of § 727 are strictly construed in the debtor's favor, while remaining cognizant that § 727 exists to prevent a debtor's abuse of the Bankruptcy

Code. *Fox v. Schmit (In re Schmit)*, 71 B.R. 587, 589–90 (Bankr.D.Minn.1987). The objecting party must prove each element by a preponderance of the evidence. *Korte v. Internal Revenue Serv. (In re Korte)*, 262 B.R. 464, 471 (8th Cir. BAP 2001).

To succeed on a § 727(a)(2) claim, the creditor must establish by a preponderance of the evidence that (1) a transfer of property occurred; (2) the property was property of the debtor; (3) the transfer occurred within one year of the petition date; and (4) at the time of the transfer, the debtor intended to hinder, delay or defraud a creditor. *First State Bank of Newport v. Beshears (In re Beshears)*, 196 B.R. 468, 475 (Bankr.E.D.Ark.1996).

The inability to adequately explain discrepancies between assets listed on financial statements provided to a lending institution and assets listed on bankruptcy schedules may give rise to a finding of intent to hinder, delay, or defraud creditors under § 727(a)(2)(A). *First Nat'l Bank of McClusky v. Zinke (In re Zinke)*, 174 B.R. 1017 (Bankr.D.N.D.1994).

After considering the difference between the value of the assets listed on the financial statement and the value of the assets listed on the schedules, I do not find that the discrepancy is a result of either the disposition of assets or concealment of assets. There is no evidence before the court that any assets were concealed or disposed of. The discrepancy actually relates to the opinion of value of the assets on the two different documents, rather than the disappearance of any of the assets. Therefore, the plaintiff has failed to meet its burden of proof on the § 727(a)(2) claim.

### IV. § 727(a)(5)

Section 727(a)(5) of the Bankruptcy Code denies a debtor a discharge if he or she has failed to explain satisfactorily any loss of assets or deficiency of assets to meet his or her liabilities. Section 727(a)(5) does not contain an intent element as part of its proof. *Beshears*, 196 B.R. at 473.

Under section 727(a)(5), when the plaintiff demonstrates a loss of assets, the burden of proof shifts to the debtor to explain the loss. *United States v. Hartman (In re Hartman)*, 181 B.R. 410, 413 (Bankr.W.D.Mo.1995). If the debtor's explanation is too vague, indefinite, or unsatisfactory then the debtor is not entitled to a discharge. *Id.* Moreover, the debtor must "explain his losses or deficiencies in such a manner as to convince the court of good faith and businesslike conduct." *Miami National Bank v. Hacker (In re Hacker)*, 90 B.R. 994, 996 (Bankr.W.D.Mo. 1987) (quoting 1A *Collier on Bankruptcy* ¶ 14.59 at 1436 (14th ed.1976)). The explanation should be sufficient so the court does not have to speculate as to what happened to the assets or speculate as to the veracity of the explanation. *Beshears*, 196 B.R. at 473 (citing *Bay State Milling Co. v. Martin (In re Martin)*, 145 B.R. 933 (Bankr.N.D.Ill.1992), *appeal dismissed*, 151 B.R. 154 (N.D.Ill.1993)).

An explanation based on the debtor's estimate, with nothing offered in the way of verification or affirmation by means of books, records, or otherwise is unsatisfactory. *Hartman*, 181 B.R. at 413 (citing *Hacker*, 90 B.R. at 997). Any loss of assets is sufficient to deny a discharge if the explanation for such loss is unsatisfactory. *Id.* The intention of the debtor is irrelevant, as is the credibility of the debtor, if the explanation is unsupported by sufficient documentation. *Id.* (citing *Hacker*, 90 B.R. at 1001–02).

■ The assertion by the credit union that both debtors should be denied a discharge under 11 U.S.C. § 727(a)(5) because of a failure to explain satisfactorily any loss of assets or deficiency of assets cannot succeed. There is no evidence of any loss of assets or deficiency of assets. The evidence concerns opinions of value of the assets on two different dates. The credit union/plaintiff has failed to meet its burden of proof.

### V. *Claims against Mrs. Lawson*

■ Finally, with regard to Mrs. Lawson, no evidence has been presented that she intentionally submitted a false financial statement. No evidence has been presented that she has any fiduciary duty to the credit union. Her loans were mainly for business purposes, although one or more may have related to a vehicle. Judgment shall be entered in her favor and she shall receive a discharge of all debts owed to the credit union. Although she has requested that the court award her costs and attorney fees under 11 U.S.C. § 523(d), I decline to make such an award because I find that the credit union's position, at least with regard to the financial statements and the debt resulting therefrom, was substantially justified, although not successful.

### VI. *Conclusion*

Separate judgment shall be entered in favor of the debtors on the 11 U.S.C. § 727(a)(2) and (5) claims for relief. Judgment shall be entered in favor of the debtor Pamela Ann Lawson on all claims for relief brought by the credit union. Judgment shall be entered in favor of the credit union and against Raymond Eugene Lawson on all of his obligations to the credit union, but for the remaining balance on the Volkswagen note. Such debts shall be deemed non-dischargeable under 11 U.S.C.

§ 523(a)(4). Finally, judgment shall be entered in favor of the debtor Raymond Lawson and against the credit union on the 11 U.S.C. § 523(a)(2)(B) false financial statement claim concerning the remaining Volkswagen debt.

### JUDGMENT

Trial was held December 15, 2003, in Lincoln, Nebraska, before a United States Bankruptcy Judge for the District of Nebraska regarding Filing # 1, Complaint for Determination of Dischargeability and Objection to Discharge. Arend Baack appeared for plaintiff, and Bert Blackwell appeared for defendants.

IT IS ORDERED:

1. Judgment is hereby entered in favor of the debtors on the 11 U.S.C. § 727(a)(2) and (5) claims for relief.

2. Judgment is hereby entered in favor of the debtor Pamela Ann Lawson on all claims for relief brought by the credit union.

3. Judgment is hereby entered in favor of the credit union and against Raymond Eugene Lawson on all of his obligations to the credit union, but for the remaining balance on the Volkswagen note. Such debts shall be deemed non-dischargeable under 11 U.S.C. § 523(a)(4).

4. Finally, judgment is hereby entered in favor of the debtor Raymond Eugene Lawson and against the credit union on the 11 U.S.C. § 523(a)(2)(B) false financial statement claim concerning the remaining Volkswagen debt.

See the Memorandum entered contemporaneously herewith.